**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **STEPHEN M. STRADTMAN** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case No.: 1:14-cv-01289-JCC-JFA** |
| | ) |
| **REPUBLIC SERVICES, INC.,** *et al.* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Republic Services, Inc., Republic Services of Virginia, LLC (collectively "Republic Services") and Ronald Krall (collectively "Defendants"), by counsel, file this Memorandum of Points and Authorities in support of their Motion for Summary Judgment.

## I.   INTRODUCTION

Only one cause of action remains in this lawsuit—Stephen Stradtman's claim that the Defendants tortiously interfered with his contractual expectancy as the CEO of Otto Environmental Services North America ("Otto").   That claim is ***not*** based on the theory that the Defendants caused Otto to terminate Stradtman or to constructively discharge him by making his employment so unpleasant that he had no choice but to resign.   In fact, the undisputed facts show that Stradtman resigned his position notwithstanding Otto's efforts to persuade him to remain in his position as its CEO.   Instead, Stradtman's theory is that he was forced to resign to protect Otto from Republic Services' alleged attempts to use its leverage as Otto's customer, to coerce Stradtman's wife into settling a Title VII suit she had brought against the Defendants. That theory fails as a matter of law for a number of reasons.

First, to prevail on his claim of tortious interference, plaintiff must show that the Defendants caused the ***third party*** with whom the plaintiff had a contractual relationship—here, Otto—to sever the relationship. *Rappahannock Pistol & Rifle Club, Inc. v. Bennett*, 262 Va. 5, 13 (2001). Because Otto did not discharge Stradtman or force him to resign, plaintiff's claim fails as a matter of law. To put it another way: having voluntarily resigned his position when he could have remained as Otto's CEO, plaintiff cannot now seek millions of dollars in damages from Defendants for the loss of that position.

Second, plaintiff's claim also fails because Virginia has yet to recognize the tort of constructive discharge in the context of at-will employment. An at-will employee cannot sue his employer on the theory that he was forced to resign. Similarly, an at-will employee cannot sue a stranger to the employment relationship on the ground that the third party forced him to resign.

Third, even if Stradtman could base his claim on the theory that he was constructively discharged from Otto, the undisputed facts preclude recovery under such a claim. Constructive discharge requires proof that the defendant deliberately sought to force a resignation by making the plaintiff's working conditions so intolerable that any reasonable person in the plaintiff's position would have felt compelled to resign. *Taylor v. Virginia Union University*, 193 F.3d 219, 237 (4th Cir. 1999). Here, the undisputed facts show that neither Otto nor Defendants did anything for the purpose of forcing Stradtman to resign. Furthermore, there is no evidence that anything Defendants did made Stradtman's tenure as Otto's CEO so difficult or distasteful that anyone in his position would have felt he had no choice but to resign. Stradtman did not even bother to tell the CEO of the parent company or Otto's board about the situation with Republic Services until after he had already accepted another job; when he first heard the story, the CEO of the parent company (who did not know that Stradtman had already accepted another job)

assured him that all would be well and that he should remain as CEO.  Although Stradtman

ultimately persuaded Otto to accept his resignation, his explanation for doing so was based, not

on what Republic Services had actually done to make his tenure as Otto's CEO difficult, but

rather what he feared it ***might*** do in the future.

Stradtman cannot salvage his claim by arguing that he had a fiduciary obligation to

resign.  Otto is a privately held company.  After hearing Stradtman's version of events, its sole

shareholder and the CEO of the parent company, who also served on Otto's board, concluded

that there was no reason for Stradtman to resign.  While Stradtman may well have had a

fiduciary obligation to disclose all material facts to his employer (which he does not appear to

have done), there is no fiduciary principle that would require an officer to resign when fully-

informed, sophisticated businessmen who owned and controlled the company saw no reason for

him to do so.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     Background

1.     Republic Services, Inc. is a parent company that through its subsidiaries and

affiliates, like Republic Services of Virginia LLC, provides nearly nationwide waste and

recycling services.  (Declaration of Eileen Schuler, Exhibit 23) (Complaint ("Compl.") at ¶ 9).

2.     Otto is a Delaware corporation (Exhibit 2) that manufactures trash/recycling carts

and provides other goods and services to municipalities and waste and recycling companies,

including Republic Services.  (Compl. at ¶¶ 21, 22, 26, 28 and 32-35) (Amended and Restated

Master Service Agreement, Exhibit 4) (Deposition of Tim Phanco, former VP of Sales for Otto,

Exhibit 24 at pp. 6:6-8; 9:10-21; 22:18-24:5).

3.      Otto is a division or wholly-owned subsidiary of the Otto Group, which is a privately held company.  (Stradtman Depo., Exhibit 1, pp. 36: 22 – 37:7, 38:1-4) (Muller Decl., Exhibit 3, ¶ 2).  Ulrich Otto owns between 98-100% of the Otto Group's stock and at all times controlled Otto.  (Stradtman Depo., Exhibit 1, pp. 38:1-4, 52:19 – 53:3, 205:19-206:1).

4.      Republic Services and its predecessors have been purchasing trash/recycling carts from Otto since at least 2008.  (Compl. at ¶¶ 32-35).

5.      In 2010, Republic Services' procurement entity entered into an Amended and Restated Master Supplier Agreement with Otto extending a prior agreement with Republic Services' predecessor by five years, to and including December 31, 2015.  (Exhibit 4 "Master Supplier Agreement" at Recitals C & D and § 3).

6.      The Master Supplier Agreement expressly stated that Republic Services was not required to purchase any minimum quantity or volume of goods or services from Otto.  (*Id.*, § 8) However, section 8 of the Agreement provided that Republic Services would extend the term of the agreement by one year if, as of December 31, 2015, its cart purchases had not averaged at least 70% of its average purchases in the 3 years prior to the new agreement or 1,050,000 carts per year.  (*Id.*).

7.      Stephen M. Stradtman became the CEO of Otto in 2005.  (Compl. at ¶ 26; Exhibit 5, Offer Letter).  He also served as a director on the company's four-person board along with Mr. Otto, Luc Miller (the CEO of the Otto Group and the person to whom Stradtman reported), and Otto's Chief Financial Officer.  (Stradtman Depo., Exhibit 1, pp. 36:22-37:11; 374:1-14) (Muller Decl., Exhibit 3 at ¶ 4).

8.      Stradtman was an at-will employee throughout his tenure at Otto.  (Muller Decl. Exhibit 3 at ¶ 5) (Stradtman Depo., Exhibit 1 at 352:19-353:8).

9.      Stradtman's initial salary was approximately $220,000, increasing to $325,000 at the time of his resignation.  (Exhibit 5, offer letter) (Muller Decl., Exhibit 3 at ¶ 5)  Stradtman was paid various bonuses during his employment, including a $270,000 bonus he negotiated in March 2012, shortly before he first raised the issue of resigning as CEO with Otto.  (Muller Decl., Exhibit 3 at ¶¶ 8-13).

10.     Stradtman was never a party to any equity plan or agreement and never received any equity in Otto or Otto Group.  (Muller Decl.; Exhibit 3 at ¶ 5) (Stradtman Depo., Exhibit 1, pp. 89:16 – 90:15; 92:14 – 93:16; 95:19-96:1).

11.     In June 2011, Stradtman became engaged to Jennifer Taylor, who was then East Region Director of Municipal Sales for Republic Service's Virginia entity, and worked in the East Region (Compl. at ¶ 41).

12.     Taylor filed an EEOC charge against Republic Services on or about September 9, 2011, alleging that she had been subjected to sexual harassment, a hostile work environment, and gender discrimination, as well as retaliation.  (Compl. at ¶ 47).  Her employment with Republic Services' Virginia entity ended in September 2011.  (Compl. at ¶ 49).

13.      Stradtman and Taylor were married on October 22, 2011.  (Stradtman Depo., Exhibit 1 at p. 12:8-10).

14.     On October 27, 2011 Taylor brought a Title VII action against the Defendants in state court, which was later removed to federal court.  (Compl. at ¶ 53).

15.     Stradtman's complaint alleges that beginning in late October 2011, various individuals at Republic suggested that Otto might be facing retaliation because of Taylor's lawsuit.  (Compl. ¶¶ 54-66).  The complaint also alleges that in the first quarter of 2012,

Defendants began retaliating against him and Taylor by redirecting orders that Otto had been anticipating receiving from Republic's East Region to Otto's competitors.  (Compl. ¶¶ 71-87).

**B.**      **Stradtman Considers Other Employment**

16.      Stradtman had posted his resume on the website of Korn Ferry, an executive recruiting firm, on May 17, 2011. (Stradtman Depo., Exhibit 1, p. 346:1-14).

17.      In December 2011, Stradtman asked the CEO of Otto Group, Luc Muller, to extend the terms of his existing employment into 2012.  Stradtman and Muller agreed that they would discuss an increase in compensation for Stradtman sometime later that year.  (Muller Decl., Exhibit 3 at ¶ 7).

18.      Although Stradtman claims that he was already concerned that Republic Services would try to pressure him to pressure Taylor to resolve her lawsuit, he said nothing during his December 2011 discussions with Muller about any issues with Republic Services, nor did he indicate that he was unhappy at Otto or was thinking of resigning.  (Muller Decl. Exhibit 3 at ¶¶ 7 and 10).

19.      On January 4, 2012, Stradtman was contacted by recruiters from another executive search firm (Charles Aris, Inc.) about an opening for a CEO position at Precision Southeast, Inc.  ("PSI")  (voice mail message and emails at Exhibits 6 and 7) (Stradtman Depo., Exhibit 1 at pp. 20:8- 21:2, 22:4- 12; 26:5 – 27:4; 27:22 - 28:8).

20.      PSI is a company located in Myrtle Beach, South Carolina, which is owned by a private equity firm, Gladstone Companies.  (Stradtman Depo., Exhibit 1 at p. 33:6-18).

21.      Stradtman listened to the recruiters and asked them to tell him more about the job opportunity. (Stradtman Depo., Exhibit 1 at pp. 22:8 –23:11).

22.     Stradtman sent his resume to the recruiters by email 13 minutes after they asked him to do so.  (Exhibit 7).

23.     The next day, January 5, 2012 Stradtman updated his resume with Korn Ferry. (Stradtman Depo., Exhibit 1 at p. 346:1-14).

24.     Charles Aris recruiters interviewed Stradtman by telephone on or about January 10, 2012 (Stradtman Depo., Exhibit 1 at pp. 71:13 – 73:13).  The recruiters completed a candidate profile form as they spoke.  (Exhibit 8) (Etling Depo., Exhibit 9 p. 20:7-23:2; Williams Depo., Exhibit 10, pp. 15:8-16:19).

25.     The recruiters asked Stradtman why he wanted to leave Otto.   (Stradtman Depo., Exhibit 1 at pp. 79:8 – 19).  He said:

- He was concerned about [Otto] ownership and where they might take the business;

- Mr. Otto did not seem to be able to reinvest appropriately in the business;

- It was unreasonable for Mr. Otto to want to grow the company to a certain level with the amount of money he planned to take out of the company;

- Mr. Otto's growth plans were inconsistent with his willingness [to invest];

- He was concerned that Mr. Otto was not willing to capitalize Otto at levels he thought appropriate;

- The amount of money that Mr. Otto wanted to take out of the company was inconsistent with his expected growth rate;

- He had been promised equity and he had not yet received it;

- He did not know yet how any equity plan that might materialize would be structured with respect to when a "transaction" would trigger payments to him;

- He had given himself a deadline of the end of 2011 to obtain a "phantom equity" plan, or he would consider leaving; and

•       Otto was thinly capitalized.

(*See*, the Candidate Profile form, Exhibit 8, pp. Aris 7 & 10 and Stradtman Depo.,

Exhibit 1, pp. 78:22 – 84:12; 88:9 – 90:15; 95:19 – 96:7; 96:19 – 97:2; 101:1 – 102:17; 103:19 –

104:17; 116:20 – 118:18).

26.     Stradtman further told the recruiters that he liked doing turnarounds.  (Stradtman

Depo., Exhibit 1, pp. 102:6 – 17).

27.      Stradtman also told the recruiters that he and his wife wanted to live in the

Southeast and that they love the coast.  (*Id.*, p. 103:19 – 104:8).

28.     The recruiters asked Stradtman whether he was using the opportunity with

Precision as leverage to persuade Otto to give him the equity he wanted.  He said no and the

recruiters wrote down on the form that they believed him.  (Exhibit 8, p. Aris 10) (Stradtman

Depo., Exhibit 1, pp. 101:19-102:5).

29.     Stradtman confirmed in his deposition that he made the statements listed above to

the recruiters and that each statement was true when made and not fabricated for the purpose of

the interview. (See cites to Statement of Fact 25 and specifically Stradtman Depo., Exhibit 1 at

pp. 117:8 -20 ("everything that we've gone over on the form… is true.")

30.     On January 16, 2012, Stradtman followed up by providing the recruiters with a 6-

page, single spaced memorandum entitled the "Otto Turnaround."  That document described

what he had done over the course of his tenure at Otto to improve the company's position.  It

also provided confidential information about Otto's budget for 2012, and described Otto as

having "its largest book of business in the company's history," as "stable and growing," and as

having a "rebuilt reputation."  (Exhibit 11 *passim* and p. PL 980) (Stradtman Depo., Exhibit 1 at

pp. 32:17 – 36:7; 54:10- 55:4).

31.     Stradtman's memo advised that Mr. Otto was likely to sell the U.S. company "in the not too distant future," and suggested that it would be a good investment for Gladstone. (Exhibit 11 at p. PL 980) (Stradtman Depo., Exhibit 1 at pp. 36:8- 37:2; 50:19 – 51:13).

32.     Stradtman provided this information without seeking permission from Otto's board or Mr. Otto himself.  (Stradtman Depo., Exhibit 1 at pp. 47:16 – 48:1)  While Stradtman asked the recruiters to keep the information confidential, he did not obtain a promise from either the recruiters or Gladstone that they would do so.  (Stradtman Depo., Exhibit 1 at pp. 47:20 – 50:5).

33.     On January 24, 2012, Stradtman provided the recruiters with a list of references. (Exhibit 12) (Stradtman Depo., Exhibit 1 at pp. 58:5 – 59:5).

34.     Shortly thereafter, Stradtman interviewed with the COO and other representatives of the Gladstone Companies.  (Stradtman Depo., Exhibit 1 at pp. 63:9-64:6).

35.     During his interview with Christopher Lee, a Managing Director at Gladstone, Stradtman said that his reasons for wanting to leave Otto were that he was not receiving the equity that he had expected and he believed he had done a lot of work to turn the company around that was not being appreciated.  (Lee Depo., Exhibit 13, at pp. 15:9-22-16:1-16).

36.     Based on his conversations with Stradtman, Mr. Lee reported to the Gladstone Companies that Stradtman wanted to leave Otto because "he's been frustrated with, at Otto, feels like he's done a ton of work, built a lot of value, and he's not being given the equity piece and that upside that he was promised."  (*Id.* at 24:12-17).

### C.     Stradtman Gets PSI Job Offer, Negotiates Bonus With Otto

37.     On March 7, 2012, Stradtman received a job offer from PSI.  (Exhibit 14, PSI offer letter).  The offer was for a lower base salary than his base salary at Otto but included equity in the company.  (*Id.*).

38.     On March 11, 2012, Muller agreed that Otto would pay Stradtman a $270,000 bonus, as additional compensation for the company's performance from 2008-2010.  (Muller Decl. Exhibit 3 at ¶ 8) (Exhibit 15, email dated March 15, 2012 referring to call "Sunday (March 11) regarding the 270K").

39.     During their negotiations about this bonus, Stradtman did not tell Muller that he was considering leaving Otto or that he had received a job offer from another company.  (Muller Decl. Exhibit 3 at ¶ 9)  Nor did he mention any claimed improper actions by Republic Services or any harm to Otto's business because of Taylor's lawsuit.  (Muller Decl., Exhibit 3 at ¶ 10).

40.     In his end of quarter report to Otto's board in March 2012, Stradtman made no mention of any order cancellations or redirections by Republic Services.  (Exhibit 16).  In fact, his report indicated that sales to Republic Services were up approximately 14% from the same period the previous year.  (Exhibit 16 at p. Otto 40130).  Concerns with revenues and gross margins were attributed to non-Republic matters.  (*Id.*).

### D.     Stradtman Continues the Hiring Process with PSI

41.     On March 19, 2012, Stradtman continued the hiring process with PSI by interviewing with a personnel consultant (ghSmart).  (Stradtman Depo., Exhibit 1 at pp. 74:20-75:4; 75:10 – 76:20).

42.     Stradtman told the ghSmart interviewer that Mr. Otto wanted to take $2 million a year out of the company and also desired significant growth for the company.  Stradtman did not believe that both goals could be met.  (Stradtman Depo., Exhibit 1 at pp. 85:5 – 88:8).

43.     Stradtman also told the ghSmart interviewer that he was frustrated that a "phantom equity plan" he had been promised at Otto had never come to fruition, and that this was a motivator for him to consider leaving.  (Stradtman Depo., Exhibit 1 at pp. 96:8 –97:2; 98:12-20; 101:1-8).

44.     Further, he told the interviewer that the "phantom equity" plan he was discussing with Otto in 2012 bore no resemblance to the one he was originally promised.  (Stradtman Depo., Exhibit 1 at pp. 118:19 – 120:4).

### E.     Stradtman Signs Offer Letter, First Tells Otto about Issues with Republic

45.     A few days after his interview with ghSmart, Stradtman sent an email to his wife's attorney sending his salary information since 2005, noting that Otto had awarded him a $270,000 bonus, which would be paid out in March, April and May, and then explaining his options "assuming I do leave the company and [file] a complaint."  (Exhibit 17, 3/22/12 Stradtman e-mail).[1]

46.     Stradtman noted that he expected a new offer from PSI soon and stated that "unless I am surprised by Otto or Republic" he would need to respond by about April 1 and so "I will need to try to force my termination between March 28, and April 1, roughly, in order to try to receive severance to support me with the new lower salary."  (*Id*.).

---

[1] On April 10, 2015, Judge Anderson ruled that any privilege had been waived with respect to this communication.  Dkt. No. 101.

47.     On April 9, 2012, Stradtman told PSI, "we have a deal," and signed a written offer letter on April 10, 2012, accepting the job as PSI's CEO.  (Exhibit 18, email) (Exhibit 19, executed offer letter) (Stradtman Depo., Exhibit 1 at, pp. 71:4-9).

48.     On April 12, 2012, Stradtman sent a lengthy email to Luc Muller to set up a conference call the next day about a "situation which has arisen and which I am very much upset with."   (Exhibit 20, Stradtman 4/12/12 e-mail and memo).

49.     Stradtman explained Taylor's lawsuit and then recounted his claim that Republic Services' Eastern Region had cancelled or redirected orders in an attempt to force a resolution of his wife's claims.  He noted that "the only issue is still in the East and we need to keep it limited to that.  After all, we can still get 70% of the business without the East Region which is contractually what we are allowed to earn." (*Id.*).  (Exhibit 20 at p. Otto 392).

50.     Stradtman stated that he had decided that Muller "needed to have all of the facts at your disposal so that you could decide how best to proceed."  He ended by saying that he "want[ed] the board to know that I am willing to move on in the best interest of Otto's success" and asked for a "termination date" after May 31, 2012 because he was in the midst of a property refinance. (Exhibit 20 at p. Otto 393) (Stradtman Depo., Exhibit 1 at pp. 195:6 – 196:20).

51.     Muller and Stradtman talked the next day.  Muller "assured [Stradtman] that the Company did not want him to resign, and that we were very happy with his performance and wanted him to continue to lead the Company."  (Muller Decl., Exhibit 3 at ¶ 14).

52.     Muller told Stradtman that "since he seemed to be saying that any problems with orders were confined to one part of Republic Services, and that our overall orders with that company were good, I didn't think, assuming what he was telling me was accurate, that our business was actually being significantly harmed."  (*Id.*).

53.     Muller told Stradtman that "in the context of our overall and long term relationship with Republic Services, the issues he was raising were not that significant, and certainly did not require him to resign."  (*Id.*).

54.     During their discussions in April, Stradtman did not tell Muller that he was looking for other employment, had interviewed for another job, or had accepted another job offer.  Nor did he say that he had any issues with the working conditions at Otto.  (*Id.* ¶ 16).

**F.      Stradtman Resigns Even Though Otto Wants Him To Remain CEO**

55.     Muller thought that his April discussion with Stradtman was the "end of [the issue]."  (*Id.* ¶ 17).

56.     But on or about May 31, 2012, Stradtman sent Muller a lengthy memo explaining that he was "still concerned about the business."  (Exhibit 21).  He stated that he "appreciate[d] the support," but "believe[d] that based on what I know now, it may be best for me to change in some way what I do for Otto or to exit entirely."  (*Id.*).  (Exhibit 21 at p. Otto 407).

57.     In the memo, Stradtman  stated that "[t]he damage at Republic is contained to the East. . . but I think it could change as the other case [the Taylor lawsuit] proceeds."  (*Id.*).

58.     Stradtman went on to explain that Otto's new financing was done, that its "backlog [of orders] is strong" and that "[l]ife should be great," but "my head and my gut are telling me that I am going to be a liability as this story plays out" because "it's going to be a couple of very nasty years, if the case moves forward."  (*Id.* at p. Otto 408).

59.     Stradtman then proceeded to play out various possible scenarios as to how "we might see things get worse, even if it is a slow process."  (*Id.*).

60.     Stradtman offered Muller three options for his exit—resignation with severance benefits, resignation and a consulting role so he could earn his severance benefits, and termination without cause "'in the best interest of both parties.'"  (*Id.* at pp. Otto 411-12).

61.     Stradtman then explained for the first time that another firm had approached him earlier in the year, said that "after a fairly exhaustive search" the recruiter had "called back and asked if I'd reconsider" the job, which he said he did because it was "close to right after the settlement talks my wife was having with Republic began to fall apart."  He said that an offer had "recently" been made and that it was the "best way to go" even though it was "not ideal for me economically" because it was a much smaller firm and offered much lower pay.  (Stradtman did not disclose that he had accepted the PSI offer in early April).  (*Id.* at pp. Otto 412-13).

62.     In response to Stradtman's memo, Muller reiterated that "we wanted him to stay at the Company."  Stradtman "insisted, however, that he wanted to resign" and so Muller accepted his resignation.  He also agreed that Otto would pay Stradtman a $70,000 bonus through his June 30, 2012 resignation date.  (Muller Decl., Exhibit 3 at ¶ 23).

63.     Stradtman voluntarily resigned his employment with Otto.  (Stradtman Depo., Exhibit 1 at pp. 371:18-374:4; Compl. ¶ 113).

64.     Stradtman submitted a resignation memo on or about June 27, 2012.  (Exhibit 22, 6/27/12 resignation memo)  That memo acknowledged that Stradtman's stated "reasoning for having to leave" might have seemed "illogical" to both Muller and Mr. Otto.  (*Id.*).

65.     Notwithstanding all of the information that Stradtman gave to Muller and Mr. Otto about the issues in Republic Services' East Region, Stradtman admits that before he left Otto, neither Muller nor Mr. Otto asked him to resign (Stradtman Depo., Exhibit 1, pp. 203:6 – 11); "quite the opposite…. they preferred that [Stradtman] stay."  (*Id.*, pp. 203:9 – 204:13).

14

### G.   Conditions At Otto Not Intolerable

66.   Stradtman admits that Otto did nothing to make him leave his job or to make his ability to act as CEO unbearable.  (Stradtman Depo., Exhibit 1, pp. 215:5 – 14).

67.   Muller confirms that Stradtman never told him that his working conditions were bad or that he disliked working at Otto.  In fact, Stradtman made it clear to Muller "that he thought very highly of Otto and that he enjoyed very much his time with us."  (Muller Decl., Exhibit 3 at ¶ 26).

### H.   No Intent To Force Resignation

68.   Stradtman acknowledges that Republic Services did not intend to force him to resign.  (Stradtman Depo., Exhibit 1, p. 353:22-354:4).[2]

## III.   ARGUMENT

### A.   Stradtman's Inability To Prove That Otto Terminated Or Constructively Discharged Him Is Fatal To His Tortious Interference Claim

Under Virginia law, a plaintiff seeking damages for tortious interference must plead and prove, among other things, that the defendant (1) knew about the plaintiff's contractual relationship or business expectancy with a third party and (2) intentionally interfered in it, (3)

---

[2] At his deposition, Stradtman was asked "What facts do you have that they intended to force you to resign?" He answered:  "I don't think they wanted me to resign."  That was followed by: " Q: Because if you had resigned, then you wouldn't-- A:  They'd lose the leverage."  Following his deposition, Stradtman submitted an errata sheet in which he sought to add after "leverage" "to force Jennifer to drop her lawsuit because they knew I could not continue in my position with the cancelations, redirected orders [and] refusal to use Otto, and the threat that the redirected orders would spread to other regions."  This attempted addition is improper because Stradtman failed to offer any reason for the need to change his testimony and in any event, cannot change what he said under oath in an effort to avoid summary judgment.   *See, e.g., du Pont v. Kolon Industries, Inc.,* 277 F.R.D. 286 (2011) (failure to provide reason for deposition change renders it without effect); *Touchcom, Inc. v. Bereskin & Parr,* 790 F. Supp. 2d 435, 465 (E.D. Va. 2011) (purpose of errata sheet is to correct alleged inaccuracies in what the deponent said at his deposition, not to modify what he wishes he had said).  But even if the "errata" were credited (which they should not be) they do not change Stradtman's admission that Defendants were not attempting to force him to resign.

causing the third party to breach or terminate the relationship or expectancy, (4) resulting in damages. *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 670 S.E.2d 704, 706 (Va. 2009) (*citing Chaves v. Johnson*, 230 Va. 112, 335 S.E.2d 97, 102 (1985)). It must be reasonably certain that, absent the alleged misconduct, the plaintiff would have realized the expectancy. *Brainware, Inc. v. Mahan,* 808 F.Supp.2d 820, 827 (E.D. Va. 2011) (relying on *N.Y. Carpet World, Inc. v. Grant,* 912 F.2d 463 (4th Cir. 1990)).

The essence of a tortious interference claim is that the defendant caused a ***third party*** to sever its contractual or business relationship with the plaintiff. *See* Restatement (Second) Torts, § 766. ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third party by inducing or otherwise causing ***the third person*** not to perform the contract, is subject to liability. . . .") (emphasis added). Thus, plaintiff would have to show that ***Otto*** terminated him as a result of Defendants' actions.

The Virginia Supreme Court applied this principle in *Rappahannock Pistol & Rifle Club, Inc. v. Bennett*, 262 Va. 5, 13 (2001), in upholding a decision granting judgment n.o.v. in favor of a defendant who had allegedly tortiously interfered with the plaintiff's contract with an existing landowner to purchase certain land to use as a gun club. In addressing the requirement that the defendant's conduct had to have caused the breach of contract, the Supreme Court explained that "[i]t is irrelevant what the [defendants] may have done to induce the [plaintiff] to abandon its plans" to purchase the property. *Id.* at 14. What was critical was for the plaintiff to show that the ***landowner*** "was induced by the [defendant] to breach the contract." *Id.* Because the plaintiff could not carry that burden, the plaintiff's tortious interference claim failed as a matter of law.

It is undisputed that Otto did not terminate Stradtman; instead, he resigned his position as Otto's CEO.  Defendants moved to dismiss the complaint on the ground that Stradtman's voluntary resignation precluded him from pursuing a tortious interference claim.[3]  Citing *Taylor v. CNA Corp.*, 782 F.Supp.2d 182, 204 (E.D. Va. 2010), Stradtman argued that his resignation was not voluntary because he was constructively discharged.  In *CNA Corp.*, the plaintiff had resigned from his job at CNA and then sued both CNA and some of his co-workers who had asserted a variety of complaints about his on-the-job behavior.  He alleged that CNA had constructively discharged him by requiring him to submit to counseling that would have caused him to lose his security clearance, which was necessary for his job.  And he sued his co-workers for tortious interference on the theory that their complaints were false and defamatory and had induced CNA to require him to (among other things) submit to counseling.  The court noted that "[t]he most glaring problem with Taylor's tortious interference claim is that he alone made the decision to resign from CNA.  It is axiomatic that a plaintiff cannot sustain a claim of tortious interference with business expectancy when he willingly surrendered his right to those expectancies."  *Id.*  It then went on to observe that "[o]f course, if conditions at CNA had

---

[3] *See, e.g., Mart v. Dr. Pepper Company,* 923 F. Supp. 1380, 1390 (D. Kan. 1996) (rejecting tortious interference claim based on voluntary resignation) (*relying on Gentry v. Hopkins,* Civ. No. 87-43227-S, 1989 WL 161439 at * 4 (D. Kan. December 19, 1989)); *Woodend v. Lenape Regional High School District,* 535 Fed.Appx. 164, 168-9 (3d Cir. 2013) (rejecting tortious interference claim where alleged "loss was caused by [plaintiff's] voluntary resignation."); *Falzone v. Licastro,* Civ. No. 1:10cv02918, 2012 WL 711273 at * 4 (N.D. Ohio March 4, 2012) (voluntary resignation "breaks the chain of causation that would have linked any alleged interference to the contract's breach"); *Geller v. Von Hagens, et al.,* Civ. No. 8:10-civ-1688, 2010 WL 4867540 at * 4 (M.D. Fla. Nov. 23, 2010) ("Defendants point is well taken that, having presented that his resignation was voluntary [plaintiff] cannot now be allowed to maintain a cause of action for tortious interference with his contract."); *Bresica v. Leff et al,* Civ. No. 3:04cv1680, 2006 WL 3231433 at * 6-7 (D. Conn. Nov. 7, 2006) (rejecting tortious interference claim, in part, based on voluntary resignation) (*relying on Appleton v. Board of Education,* 254 Conn. 205 (2000) (no tortious interference claim where plaintiff voluntarily resigned); *Thompson v. City of Columbus et al.,* Civ. No. C2-98-822, 2001 WL 1681129 at * 6 (S.D. Ohio Sept. 26, 2001) (tortious interference claims fail because plaintiff voluntarily left employment).

become so intolerable that Taylor were effectively left no practical choice other than quitting, then it would be unfair to characterize his decision as willingly made." *Id.*  Because the court had already concluded that the plaintiff could not prove that he had been constructively discharged, however, it held that his tortious interference claim failed as well.  *Id.*

This Court denied Defendants' motion to dismiss Count I of Stradtman's Complaint because it concluded, at that early stage of the case, that his tortious interference claim under a constructive discharge theory should proceed.  But the undisputed facts show that Stradtman cannot demonstrate that ***Otto*** constructively discharged him.  Constructive discharge requires proof that the employer deliberately set out to force the employee to resign by making working conditions intolerable.  *See Taylor v. Virginia Union University*, 193 F.3d at 237.  Here, the undisputed facts show that Otto never did anything to affect Stradtman's working conditions and, far from trying to push him into resigning, it affirmatively sought to retain his services as CEO. Thus, Stradtman's resignation was plainly voluntary.  Stradtman could have remained in his position as Otto's CEO indefinitely.  Stradtman cannot seek millions in damages from Defendants for tortious interference when he himself chose to resign from his job.

### B.   Plaintiff's Theory That Defendants Somehow Forced Him To Resign   Fails On The Law And The Facts

Plaintiff's theory is apparently that Defendants' conduct affected the conditions of his employment to such an extent that he felt compelled to resign—against Otto's wishes.  That theory fails both on the law and the facts.

### 1.   Virginia Does Not Recognize Constructive Discharge

First, Virginia does not recognize constructive discharge as a cause of action in employment cases when the plaintiff was an at-will employee.  There is no reason to believe that it would recognize that concept in the far more attenuated context at issue here.

In *Gordon v. ArmorGroup, N.A.,* 2010 WL 3418219, *4 (E.D. Va. Aug. 27, 2010), this Court held that "under Virginia law an at-will employee cannot" be constructively discharged. As the Court explained, Virginia adheres to the employment-at-will doctrine under which an at-will employee can be discharged—or resign—for any reason on reasonable notice. The only exception the Virginia Supreme Court has recognized is where an "employee was fired in violation of an established public policy." *Id.* (internal quotation marks omitted). The Virginia Supreme Court has not expanded that public policy exception to include a claim of constructive discharge. As the Fourth Circuit held in upholding the dismissal of a constructive discharge claim under Virginia law, a "federal court should use caution in extending state law to a point beyond which a state's highest court has not taken it." *Hairston v. Multi-Channel TV Cable Co.*, 79 F.3d 1141, 1996 WL 119916, at *2 (4th Cir. Mar. 19, 1996) (unpublished) (internal quotation marks omitted).

In *Gordon*, this Court dismissed a state law constructive discharge claim against the plaintiff's employer as well as tortious interference claims brought against the plaintiff's fellow employees for bringing about the alleged constructive discharge. Both claims, the Court held, failed because Virginia would not recognize a claim for constructive discharge of an at-will employee and thus any and all claims based directly or indirectly on that theory necessarily failed. 2010 WL 3418219, *4.[4] If this Court continues to adhere to its ruling, plaintiff's claim necessarily fails as matter of law.

---

[4] The Court reaffirmed its ruling in denying the plaintiff's motion for reconsideration. See *Gordon v. ArmorGroup, N.A.,* 2010 WL 4272979 (E.D. Va. Oct. 19, 2010). *See also Gastyne v. Entrust, Inc.,* 2010 WL 3418235, *11 (E.D. Va. Aug. 24, 2010) (dismissing plaintiff's action for constructive discharge); *Dixon v. Denny's,* 957 F.Supp. 792, 799 (E.D. Va. 1996) (dismissing an employee's claim for constructive discharge, ruling "as a matter of law that a claim for constructive discharge does not yet exist under Virginia law"); *Michael v. Sentara Health Sys.,* 939 F.Supp. 1220, 1232-33 (E.D. Va. 1996) (same). *Taylor v. CNA Corp.* is not to the contrary

We recognize that recently the court in *Faulkner v. Dillon*, 2015 WL 11291411 (W.D.Va. Mar. 23, 2015), held that a plaintiff could proceed with a public policy wrongful discharge claim predicated upon a constructive discharge theory.   In doing so, the court acknowledged that both federal and state courts, including the Fourth Circuit in *Hairston*, had come to the opposite conclusion.   Nonetheless, the district court permitted the plaintiff to proceed with her claim based on what the court perceived to be the trend in Virginia trial courts.

Significantly, however, the court in *Faulkner* limited the tort of constructive discharge to a situation where the forced termination "was in violation of clear and unequivocal public policy of this Commonwealth, that no person should have to suffer such indignities" ***and*** "that the employer's actions were deliberate and created intolerable working conditions."  *Id.* at *5 (internal quotation marks omitted).  The court concluded that this stringent standard was met under the facts pleaded in *Faulkner*, where the plaintiff alleged that her employer had repeatedly sexually harassed her until she was so distraught that she suffered nightmares, panic attacks, and contemplated suicide.  *Id*. at *1.  Because the Virginia Supreme Court has recognized sexual harassment as a public policy exception to the at-will employment doctrine, the court concluded that it would also extend that exception to a situation where the plaintiff quit because her employer's sexual harassment created intolerable employment conditions.  *Id.* at *4.

Even if this Court were to apply the more liberal interpretation of the at-will employment doctrine in *Faulkner*, Stradtman's claim would fail as a matter of law.  Stradtman does not contend, nor could he, that Republic Services subjected him to the kinds of "indignities" that no person should have to suffer.  Nor can he point to any "clear and unequivocal public policy" in

---

because that case did not address the question of whether a constructive discharge theory is available under Virginia law.

Virginia that could be invoked to extend the public policy exception to the normal at-will employment rules to the kind of situation at issue here.

### 2. Plaintiff Has Admitted That Defendants Did Not Deliberately Set Out To Force Him Out Of His Position As Otto's CEO

Even if Stradtman could invoke a constructive discharge theory, however, he would have to show that Defendants *deliberately* sought to force him out of his position as CEO by making his position as such intolerable. *See Taylor v. Virginia Union University*, 193 F.3d at 237 (plaintiff was required to prove that the defendant "deliberately made [his] working conditions intolerable in an effort to induce [him] to quit") (internal quotation marks omitted). Although the context here is different than in the ordinary constructive discharge case, the principle is the same: to prove that Defendants tortiously interfered in his employment relationship, plaintiff would have to show that Defendants *intended* to cause him to be terminated or to force him to resign.

Stradtman, however, has unequivocally admitted that Defendants did *not* intend to persuade Otto to fire him or to force him to resign (SOF 51), and there is no evidence that the resignation was certain or substantially certain to occur absent Defendants' alleged misconduct (SOF 68). *See Commerce Funding Corp. v. Worldwide Sec. Servs., Corp.*, 249 F.3d 204, 212-13 (4th Cir. 2001) (intent may be shown by demonstrating that defendant knew that the interference—here, Stradtman's departure from Otto—was certain or substantially certain to occur). Nor would it have made sense under plaintiff's own theory of the case for Republic Services to force Stradtman to resign. Stradtman's theory is that the Defendants were withholding orders from Otto to force a settlement of the Taylor lawsuit. Such a ploy required Stradtman to remain at the helm of Otto. Thus, even apart from Stradtman's admission, a rational jury could not have accepted Stradtman's theory with respect to the Defendants' motives

21

while at the same time finding that the Defendants had deliberately set out to separate Stradtman from his job as Otto's CEO.

> **3.    Plaintiff Cannot Show That Defendants Made The Conditions Of His Employment So Intolerable That Any Reasonable Person Would Have Quit**

Yet another reason for granting summary judgment on Stradtman's sole remaining claim is that he does not contend and cannot show that Defendants made his working conditions so intolerable that any reasonable person in his position would have been forced to resign.  It is well settled that "[i]ntolerability is judged by an objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign."  *Byers v. HSBC Fin. Corp.*, 416 F.Supp.2d 424, 441-42 (E.D. Va. 2006) (citing *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985)).  As the Fourth Circuit explained in *Bristow*:

> "An employee may not be unreasonably sensitive to his working environment." Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that some adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

770 F.2d at 1255 (citation omitted).  *Accord*, *Mativa v. Bald Island Management, Inc.*, 259 F.3d 261, 272 (4th Cir. 2001); *Carter v. Bell*, 33 F.3d 450, 459 (4th Cir. 1994); *Harmon v. CB Squared Services, Inc.*, 624 F.Supp.2d 459, 477 (E.D.Va. 2009).

The same principles apply with even greater force to a claim that a third party interfered with the plaintiff's employment relationship by effectively forcing him to resign.  Tortious interference requires proof that the ***defendant's wrongful conduct*** directly caused the termination of the employment relationship.  Assuming that constructive discharge is a viable

theory in this context, that standard cannot be met simply by showing that the third party caused the employee some upset or consternation to which he or she responded by quitting.  Indeed, "[b]ecause the claim of constructive discharge is so open to abuse by those who leave their employment of their own accord, this Circuit has insisted that it be carefully cabined."  *Paroline v. Unisys Corp.,* 879 F. 2d 100, 114 (4th Cir. 1989).  And the "law will not provide relief to every disgruntled player in the rough-and-tumble world comprising the competitive marketplace."  *Lewis-Gale Medical Center, LLC v. Alldredge,* 282 Va. 141, 153 (2011) (quoting *Goode v. Burke Town Plaza, Inc.,* 246 Va. 407, 411 (1993)).

Here, a rational jury could not conclude, based on the undisputed facts, that Stradtman was facing objectively intolerable conditions that would have caused any reasonable person to conclude that he had no choice but to resign.  Indeed, even Stradtman does not appear to have viewed what Republic Services actually ***did*** as requiring his resignation.  It was not until April 12, 2012—after Stradtman had already accepted a new position[5]—that he first disclosed to his superiors his theory that Defendants were trying to use Otto as leverage to resolve the Taylor lawsuit.  If Otto had been in a dire situation because of Republic Services' actions and Stradtman perceived himself as having a conflict of interest, he had an obligation to disclose that conflict to his superiors. Yet his first quarter report to the Otto Board at the end of March 2012 failed even to mention any problem with Republic Services and instead noted a year-over-year increase in purchases from Republic Services.

---

[5] Stradtman's job search efforts and acceptance of a new job before resigning similarly preclude a reasonable jury from determining that he was forced to resign.  *Honor v. Booz-Allen & Hamilton, Inc.,* 383 F.3d 180, 188 (4th Cir. 2004) (affirming summary judgment on constructive discharge claim in part, based on employee's job search efforts prior to resignation and stating, "[plaintiff] did not part from Booz Allen under circumstances that a reasonable jury could find that he was forced to resign.  His search for other employment and his resignation announcement…foreclose any contrary conclusion.") (citations omitted).

Furthermore, the two lengthy memos Stradtman wrote  in an attempt to persuade Muller that Otto should terminate him or at least accept his resignation do not suggest that Defendants had inflicted any serious harm on Otto.  On the contrary, both memos make clear that the issues Stradtman identified were limited to the East Region.  Stradtman predicted that the situation would worsen if he did not step aside.  But predictions of what ***might*** happen in the future are not nearly enough to make an employment situation so intolerable ***today*** that the employee has no choice but to resign.

That is particularly true inasmuch as Stradtman's superiors, when fully informed of what had already happened and Stradtman's predictions of future problems, thought there was no need for him to resign and declined to terminate him.  Plaintiff argues that he felt he had a fiduciary obligation to resign to protect Otto.  But whether he was constructively discharged does not depend on Stradtman's subjective feelings; rather, it depends on what an objective person in his position would have thought and done.  As Stradtman's April 12 memo to Muller recognized, the proper course for him to take was to disclose the situation and his own personal position to the Otto Board and let it make a decision about what was in Otto's best interests.  *See Mills Acquisition Co. v. MacMillan Inc.*, 559 A.2d 1261, 1280 (Del. 1988) ("It is basic to our law that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 *Del.C.* § 141(a)"); *see also*. *White v. Panic*, 783 A.2d 543 (Del. 2001) (affirming dismissal of derivative action brought against CEO on the ground that it was up to the Board to make a business judgment as to how to deal with claims against the CEO).  The Otto bylaws make clear that Directors, like Stradtman, serve at the direction of the Board and can be removed by it.  (Exhibit 2, Otto Bylaws at §§ 4.6, 5.3).

It is undisputed that Otto told Stradtman that there was no reason for him to resign.  That alone forecloses his claim.  Under those circumstances, no reasonable person would have concluded that he had no choice but to resign.  That Stradtman nevertheless insisted on stepping aside precludes him from seeking damages from Defendants on the theory that their conduct forced him to resign.

## IV.    CONCLUSION

Stradtman voluntarily resigned his employment.  He was not forced to resign by his employer or his working conditions, and he was not fired or constructively discharged.  Stradtman's tortious interference claim therefore fails and Defendants' motion for summary judgment should be granted.

May 8, 2015                                    Respectfully submitted,

                                              **REPUBLIC SERVICES, INC.,** *et al.*
                                              By Counsel
                                              /s/ _____
                                              Bernard J. DiMuro, Esq. (VSB # 18784)
                                              Jonathan R. Mook, Esq. (VSB # 19177)
                                              M. Jarrad Wright, Esq. (VSB #68814)
                                              DIMUROGINSBERG, P.C.
                                              *Counsel for Defendants*
                                              1101 King Street, Suite 610
                                              Alexandria, Virginia  22314-2956
                                              Ph. (703) 684-4333
                                              Fax (703) 548-3181
                                              bdimuro@dimuro.com
                                              jmook@dimuro.com
                                              mjwright@dimuro.com


                                              Christine M. Costantino, Esq. (VSB # 86986)
                                              Raymond C. Baldwin (admitted *pro hac vice*)
                                              SEYFARTH SHAW LLP
                                              *Counsel for Defendants*
                                              975 F Street, N.W.
                                              Washington, DC 20004
                                              Telephone: 202.463.2400
                                              Facsimile: 202.828.5393
                                              ccostantino@seyfarth.com
                                              rbaldwin@seyfarth.com

## CERTIFICATE OF SERVICE

        I hereby certify that on the 8th day of May, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

                                              /s/ _____
                                              Bernard J. DiMuro, Esquire (VSB # 18784)
                                              Jonathan R. Mook, Esquire (VSB # 19177)
                                              M. Jarrad Wright, Esquire (VSB #68814)
                                              DIMUROGINSBERG, P.C.
                                              *COUNSEL FOR DEFENDANTS*
                                              1101 King Street, Suite 610
                                              Alexandria, Virginia  22314-2956
                                              Ph. (703) 684-4333
                                              Fax (703) 548-3181
                                              bdimuro@dimuro.com
                                              jmook@dimuro.com
                                              mjwright@dimuro.com