IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| STEPHEN M. STRADTMAN, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|        v. | )    1:14cv1289 (JCC/JFA) |
| | ) |
| REPUBLIC SERVICES, INC., | ) |
| et al., | ) |
| | ) |
|     Defendants. | ) |

**M E M O R A N D U M   O P I N I O N**

Plaintiff Stephen M. Stradtman ("Stradtman") filed
suit against Defendants Republic Services, Inc., Republic
Services of Virginia, LLC, and Ronald Krall (collectively
"Defendants") originally alleging three counts under Virginia
law: (1) tortious interference with contractual relations; (2)
conspiracy; and (3) negligent retention of employees.  (Compl.
[Dkt. 1-3] ¶¶ 121-170.)  Stradtman requests millions of dollars
in compensatory and punitive damages.  (Id. at 32.)  The Court
previously granted in part Defendants' motion to dismiss, and
dismissed counts two and three of the Complaint, leaving only
one claim for tortious interference with contractual relations
("tortious interference").  (Nov. 25, 2014 Mem. Op. [Dkt. 14];
Order [Dkt. 15].)  The matter is currently set for a jury trial
to commence on July 6, 2015.

1

Stradtman claims that Defendants tortiously interfered with contractual rights regarding his former employment as the Chief Executive Officer ("CEO") of Otto Industries North America, Inc. ("Otto"), a trash and recycling cart manufacturer. (Compl. ¶¶ 121-140.)  Stradtman alleges that Defendants diverted their business away from Otto in an attempt to force his resignation.  (Id.)  Stradtman claims this was done in retaliation for a discrimination lawsuit that Stradtman's wife had filed against Defendants.  (Id.)  Stradtman believes he had no choice but to resign because of Defendants' improper methods and interference with his employment at Otto.  (Id.)

This matter is now before the Court on Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Defs.' Mot. for Summ. J. [Dkt. 142]; Defs.' Mem. in Supp. of Mot. for Summ. J. [Dkt. 143].) Stradtman filed a brief in opposition (Pl.'s Opp'n [Dkt. 164]), to which Defendants replied (Defs.' Reply [Dkt. 170].)  On June 4, 2015, the Court heard oral argument of counsel and granted Defendants' motion in open court, which is memorialized herein.

## I. Background

The following facts are taken from the parties' Local Rule 56(B) statements and are undisputed[1] unless otherwise

---

[1] For ease, undisputed facts are referred to by "SOF" without a party designation.

indicated.  (See Defs.' Stmt. of Facts ("SOF") [Dkt. 143] at 3-15; Pl.'s SOF [Dkt. 164] at 3-13.)

Republic Services, Inc. ("Republic") provides nationwide waste and recycling services through its subsidiaries and affiliates, including Republic Services of Virginia, LLC ("Republic-Virginia").  (SOF ¶ 1.)  Otto[2] manufactures trash and recycling carts, and contracts with municipalities and waste removal companies, including Republic, for other goods and services.  (SOF ¶ 2.)  In 2005, Stradtman became CEO of Otto and served as a director on the four-person board of directors. (SOF ¶ 7.)  Stradtman was an at-will employee.  (SOF ¶ 8.)

Since at least 2008, Republic has been purchasing carts from Otto.  (SOF ¶ 4.)  In 2010, Republic entered into an "Amended and Restated Master Supplier Agreement" with Otto, which extended their prior agreement for an additional five years, or until December 31, 2015.  (SOF ¶ 5.)  This agreement could be extended one additional year if, as of December 31, 2015, Republic had not averaged at least 70% of the average purchases for the 3-year period prior to execution of the agreement.  (SOF ¶ 6.)

On May 17, 2011, Stradtman posted his resume on the website of Korn Ferry, an executive recruiting firm, even though

---

[2] Otto is a subsidiary of the Otto Group, a privately owned company controlled by Ulrich Otto ("Mr. Otto"), who owns between 98-100% of the stock.  (SOF ¶ 3.)

he was not actively looking for a new job.  (Defs.' SOF ¶ 16

(citing Stradtman Dep. [Dkt. 143-1, 143-2] at 346); Pl.'s SOF ¶

16 (citing Stradtman Dep. [Dkt. 164-3] at 347-48).)  In June of

2011, Stradtman became engaged to marry Jennifer Taylor

("Taylor"), the then-East Region Director of Municipal Sales for

Republic-Virginia.  (SOF ¶ 11.)  On September 9, 2011, Taylor

filed an EEOC charge against Republic alleging sexual

harassment, hostile work environment, gender discrimination, and

after her employment with Republic-Virginia was terminated,

retaliation.  (SOF ¶ 12.)  On October 22, 2011, Stradtman and

Taylor were married.  (SOF ¶ 13.)  On October 27, 2011, Taylor

filed a discrimination lawsuit against Defendants.[3]  (SOF ¶ 14.)

In December of 2011, Stradtman asked the CEO of Otto Group and

fellow Otto board member, Luc Muller ("Muller"), to extend his

employment into 2012 and did not raise any concerns about

Republic or mention that he was seeking out other job

opportunities.  (SOF ¶¶ 17-18 (citing Muller Decl. [Dkt. 143-4]

¶ 7; Stradtman Decl. [Dkt. 164-1] ¶ 16).)

     In early January of 2012, Stradtman was contacted by

an executive recruiter from Charles Aris, Inc. regarding an

opening for a CEO position at Precision Southeast, Inc. ("PSI")

in Myrtle Beach, South Carolina, a company that is owned by the

---

[3] Taylor ultimately prevailed in this lawsuit, obtaining back
pay, front pay, and compensatory damages.  See Taylor v.
Republic Servs., Inc., 968 F. Supp. 2d 768 (E.D. Va. 2013).

private equity firm Gladstone Companies ("Gladstone").  (SOF ¶¶ 19-20.)  When asked why he wanted to leave his position as CEO of Otto, Stradtman responded that he was concerned about the direction of Otto, frustrated with the inability of Otto to structure an equity plan for him, and that he disagreed with Mr. Otto's compensation, which in his opinion, was at odds with growing the company.  (Defs.' SOF ¶ 25 (citing Stradtman Dep. at 79-84; Charles Aris Candidate Profile [Dkt. 143-9] at 10); Pl.'s SOF ¶ 25 (citing Stradtman Dep. at 348-49; Stradtman Decl. ¶ 34; Williams Dep. [Dkt. 164-4] at 10-11, 23-24).)  One day later, Stradtman updated, or re-uploaded, his resume with Korn Ferry. (Defs.' SOF ¶ 23; Pl.'s SOF ¶ 23.)

On January 16, 2012, Stradtman provided the Charles Aris recruiters with a six-page memorandum entitled "Otto Turnaround" that described his accomplishments at Otto.  (Defs.' SOF ¶¶ 30, 32 (citing Otto Turnaround Mem. [Dkt. 143-12]); Pl.'s SOF ¶¶ 30, 32 (citing Stradtman Dep. at 38, 48-49).)  It is disputed whether the information Stradtman provided contained confidential business information.  (Id.)  On January 24, 2012, Stradtman provided the recruiters with a list of references. (SOF ¶ 33.)  Shortly thereafter, Stradtman interviewed with Christopher Lee, the Managing Director of Gladstone, who reported that Stradtman wanted to leave Otto because "he's been frustrated with, at Otto, feels like he's done a ton of work,

built a lot of value, and he's not being given the equity piece and that upside that he was promised" and that he was "[l]ooking for an opportunity to grow a business, looking to recreate some of the success he had in his former company."  (Defs.' SOF ¶¶ 34-36 (citing Lee Dep. [Dkt. 143-14] at 24:12-17); Pl.'s SOF ¶¶ 34-36 (citing Lee Dep. [Dkt. 164-5] at 14-15).)

On March 7, 2012, PSI offered Stradtman the CEO position at PSI for a lower base salary than his base salary at Otto,[4] but also included an offer of equity in the company.  (SOF ¶ 37 (citing PSI Offer Letter [Dkt. 143-15]).)  Four days later, on March 11, 2012, Muller agreed to pay Stradtman $270,000, which can either be described as a bonus that would compensate Stradtman for Otto's performance from 2008 to 2010, or a payment in lieu of equity for the years 2008 and 2011.  (Defs.' SOF ¶ 38 (citing Muller Decl. ¶ 8); Pl.'s SOF ¶ 38 (citing Stradtman Dep. at 392).)  During the negotiation of this payment, Stradtman did not tell Muller that he was considering leaving Otto, that he had interviewed with PSI, that he received the job offer to become CEO of PSI, or that there were any problems with Republic retaliating for Taylor's lawsuit.  (SOF ¶ 39 (citing Muller Decl. ¶¶ 9-10).)  In his March 2012 end of quarter report to Otto, Stradtman reported that sales to Republic were up

---

[4] By this point, Stradtman's annual salary was approximately $332,800.  (Muller Decl. ¶ 5.)

approximately 14% from the same period the previous year and did

not mention any order cancellations or redirections by Republic;

instead, any concerns were attributed to non-Republic matters.

(Defs.' SOF ¶ 40 (citing March 2012 Report [Dkt. 143-17]); Pl.'s

SOF ¶ 40 (citing Stradtman Decl. ¶ 6).)

On March 19, 2012, Stradtman continued the hiring

process with PSI by interviewing with ghSmart, a personnel

consultant.  (SOF ¶ 41.)  Stradtman again raised concerns about

Mr. Otto's investment in the company and that he was frustrated

with his lack of equity in Otto.  (Defs.' SOF ¶¶ 42-43 (citing

Stradtman Dep. at 85-88, 96-97, 98, 101); Pl.'s SOF ¶¶ 42-43

(citing Stradtman Dep. at 348-49).)  On March 22, 2012,

Stradtman sent an e-mail to Ms. Brown, the attorney representing

Taylor in the discrimination suit against Republic, who also now

represents him in this matter.  (SOF ¶ 45 (citing E-mail to Ms.

Brown [Dkt. 143-18]).)  In the e-mail, Stradtman referenced his

prior compensation from Otto, his job offer with PSI, and his

expectation of receiving the $270,000 payment from Otto in

March, April, and May of 2012.  (Id.)  Stradtman also wrote that

he "will need to try to force [his] termination [from Otto]

between March 28 and April 1, roughly, in order to try to

receive severance to support me with my new lower salary."  (SOF

¶ 46.)  Stradtman disputes any implication that he wanted to be

terminated, and instead claims that by labeling his separation a

7

"termination," he would be allowed to collect severance to account for the 50% pay cut he would take in his new job at PSI. (Pl.'s SOF ¶ 46.)

On April 10, 2012, Stradtman accepted the CEO position with PSI by signing a written offer letter.  (SOF ¶ 47 (citing Executed Offer Letter [Dkt. 143-20).)  Two days later, Stradtman scheduled a conference call with Muller to discuss "a situation which has arisen and which I am very upset about, but which must be dealt with professionally and quickly."  (SOF ¶ 48 (citing E-mail to Muller [Dkt. 143-21]).)  During this communication, Stradtman raised issues regarding cancelled or redirected orders by Republic in the East Region for the very first time.  (SOF ¶¶ 49-50 (citing E-mail to Muller at 390-93).)  Stradtman stated that he was "willing to move on in the best interest of Otto's success."  (SOF ¶ 50 (citing E-mail to Muller at 393).)

Initially, Muller expressed his desire for Stradtman to remain at Otto and not resign.  (Pl.'s SOF ¶ 53.)  Muller talked to Stradtman on April 11, 2012 and "assured him that the Company did not want him to resign, and that we were very happy with his performance and wanted him to continue to lead the Company."  (SOF ¶ 51 (citing Muller Decl. ¶ 14).)  Muller told Stradtman that "in the context of our overall and long term relationship with Republic Services, the issues he was raising were not that significant, and certainly did not require him to

8

resign." (SOF ¶ 53 (citing Muller Decl. ¶ 14).) During this initial conversation, Stradtman did not tell Muller that he was looking for other employment, that he had interviewed for another job, or that he had accepted a job offer from PSI. (SOF ¶ 54 (citing Muller Decl. ¶ 16).) Muller thought that this discussion was the end of "the issue." (Defs.' SOF ¶ 55 (citing Muller Decl. ¶ 17).) Stradtman finds this hard to believe. (Pl.'s SOF ¶ 55 (citing Stradtman Decl. ¶ 21).)

On May 31, 2012, Stradtman sent Muller a lengthy memorandum explaining that he was still concerned about potential damage to Otto's business from Republic's action in the East Region and that he predicted "it's going to be a couple of very nasty years" if Taylor's discrimination lawsuit moved forward. (SOF ¶¶ 56-59 (citing May 31, 2012 Mem. [Dkt. 143-22] at 407-14).) Stradtman offered Muller three options for his exit from Otto: resignation with severance benefits, resignation and a consulting role so he could earn his severance benefits, or termination without cause. (SOF ¶ 60 (citing May 31, 2012 Mem. at 411-12).) Stradtman also explained, for the first time, that another firm had approached him earlier in the year, that an offer had recently been made, and that it was the "best way to go," but did not disclose that he had already accepted the offer from PSI. (SOF ¶ 61 (citing May 31, 2012 Mem. at 412-13).) In response, Muller again reiterated that "we wanted him

to stay at the Company" and that Otto would pay Stradtman an additional $70,000 bonus through his resignation date to ensure a proper transition.  (SOF ¶ 62 (citing Muller Decl. ¶ 23).)

Effective June 30, 2012, Stradtman resigned as CEO of Otto.  (Defs.' SOF ¶¶ 63-64 (citing Resignation Letter [Dkt. 143-23]).)  Stradtman remembers Muller telling him at the time that "he understood there was no good decision" for Stradtman. (Pl.'s SOF ¶ 64 (citing Stradtman Dep. at 372).)  Neither Muller nor Mr. Otto asked Stradtman to resign.  (Defs.' SOF ¶¶ 65-67 (citing Stradtman Dep. at 203 ("Quite the opposite. . . . They preferred that I stay."); id. at 215, 353-54); Pl.'s SOF ¶¶ 65-67 (citing Stradtman Dep. at 393).)  Otto did not force Stradtman to leave his job, or make his ability to act as CEO unbearable.  (Id.)  Stradtman believed that his fiduciary duty to Otto required him to resign for the good of the company. (Id.)

## II. Legal Standard

Summary judgment is appropriate only where, on the basis of undisputed material facts, the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of

10

material fact." _Celotex_, 477 U.S. at 323.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. _See_ _Matsushita Elec. Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 586-87 (1986); _see also_ _Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc._, 673 F.3d 294, 299 (4th Cir. 2012) (stating the opposing party must "come forward with specific facts showing that there is a genuine issue for trial.").  "[T]he non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'"  _Hughes v. Bedsole_, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting _Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 256 (1986)).

In reviewing the record on summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant."  _Brock v. Entre Computer Ctrs., Inc._, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  _Anderson_, 477 U.S. at 249.  Where there is conflicting evidence, the court must credit the evidence of both sides and acknowledge that there is

11

a genuine issue of material fact that cannot be resolved by summary judgment.  See Tolan v. Cotton, 134 S. Ct. 1861, 1868-69 (2014) (stating that summary judgment is inappropriate where each side has put forward competent evidence that raises a dispute about a material fact).

### III. Analysis

The Court finds that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law.  Stradtman's tortious interference claim fails for three reasons.  First, Stradtman fails to prove that Defendants induced a third party to terminate his employment contract.  Second, Stradtman's voluntary resignation breaks the causal chain between any supposed interference by Defendants and the termination of his employment with Otto.  Third, Stradtman was not constructively discharged or forced to resign.  All three reasons are anchored in the undisputed fact that Otto did not terminate Stradtman's employment.  Regardless, each is addressed in turn.

### A. Third Party Otto Did Not Terminate Stradtman

In 1985, the Supreme Court of Virginia[5] first recognized the common law tort of intentional interference with contract rights.  See Chaves v. Johnson, 335 S.E.2d 97, 102 (Va.

---

[5] There is no dispute that Virginia law applies to the substantive tortious interference claim.

1985) ("We have not previously had occasion to consider this
precise aspect of the law of torts . . . ."). In doing so, the
Supreme Court of Virginia joined the Supreme Court of the United
States, the Queen's Bench, and many other sister states. <u>Id.</u>
(citing <u>Angle v. Chicago</u>, 151 U.S. 1 (1894) (additional
citations omitted); <u>Lumley v. Gye</u>, 2 El. & Bl. 216, 118 Eng.
Rep. 749 (1853)). The Court also expressly referenced and
relied on the Restatement (Second) of Torts:

> The tort is succinctly described in
> Restatement (Second) Torts § 766 (1977):
>
> Intentional Interference with Performance of
> Contract <u>by Third Party</u>
>
> One who intentionally and improperly
> interferences with the performance of a
> contract (except a contract to marry)
> between another and a third person by
> <u>inducing or otherwise causing the third
> person not to perform the contract</u>, is
> subject to liability to the other for
> pecuniary loss resulting to the other from
> <u>the failure of the third person to perform
> the contract</u>.

<u>Chaves</u>, 335 S.E.2d at 102 (emphasis added).

Even in its most recent cases, the Supreme Court of
Virginia cites back to <u>Chaves v. Johnson</u> when discussing the
elements required for a prima facie case of intentional
interference with contract rights. <u>See, e.g.</u>, <u>Dunlap v. Cottman
Transmission Sys., LLC</u>, 754 S.E.2d 313, 318 (Va. 2014) ("We
recognized a cause of action for tortious interference with

contract rights in <u>Chaves v. Johnson</u>, 230 Va. 112, 335 S.E.2d 97

(1985).").  Those elements are:

> (1) the existence of a valid contractual
> relationship or business expectancy; (2)
> knowledge of the relationship or expectancy
> on the part of the interferor; (3)
> intentional interference inducing or causing
> a breach or termination of the relationship
> or expectancy; and (4) resultant damage to
> the party whose relationship or expectancy
> was disputed.

<u>Id.</u> (quoting <u>Chaves</u>, 335 S.E.2d at 102; <u>Dunn, McCormack &</u>

<u>MacPherson v. Connolly</u>, 708 S.E.2d 867, 870 (Va. 2011)).  If the

contract at issue is terminable at will, the plaintiff must also

prove the defendant employed improper methods[6] in interfering

---

[6] While not extensively briefed by the parties, the Court finds
that it is undisputed that, assuming Defendants did divert
business away from Otto, such acts did not constitute "improper
methods" under Virginia law because choosing one vendor over
another in and of itself is not illegal.  Stradtman argues that
"Defendants sought to create a conflict of interest between Mr.
Stradtman and Otto, with knowledge that this would interfere
with Mr. Stradtman's employment."  (Pl.'s Opp'n at 20 (citing
Stradtman Dep. at 363-64, 369-70).)  This argument stretches the
logical bounds of Virginia law.  "Under Virginia law, a threat
to perform an act one is legally entitled to perform is not a
wrongful act."  <u>Lewis-Gale Med. Ctr., LLC v. Alldredge</u>, 710
S.E.2d 716, 722 (Va. 2011) (citations omitted).  It is
undisputed that Republic had contracted with Otto.  But there
was no other legal relationship or obligation that bound
Republic to buy carts from Otto.  Any remedy for Republic's
cancellation of orders lied in a breach of contract action.
Hypothetically, if Republic's actions violated the terms of
their agreement with Otto, then Otto presumably could have
sought to hold Republic liable for such a breach.  But "the law
will not provide relief to every disgruntled player in the
rough-and-tumble world comprising the competitive marketplace."
<u>Id.</u> (quoting <u>Williams v. Dominion Tech. Partners, LLC</u>, 576
S.E.2d 752, 758 (Va. 2003)).  The law only provides a remedy for

with the contract.  Dunlap, 754 S.E.2d at 318 n.5 (listing

improper methods) (citations and internal quotations omitted).

"[T]ortious interference with contract . . . [is] predicated on

the common law duty to refrain from interfering with another's

contractual and business relationships.  That duty does not

arise from the contract itself but is, instead, a common law

corollary of contract."  Dunlap, 754 S.E.2d at 319 (citing Wyatt

v. McDermott, 725 S.E.2d 555, 558 (Va. 2012)).

The Virginia Supreme Court has held that it is

irrelevant whether defendants intentionally acted to induce the

plaintiff to terminate the relationship or otherwise abandon the

expectancy.  Rappahannock Pistol & Rifle Club, Inc. v. Bennett,

546 S.E.2d 440, 444 (Va. 2001).  Instead, the essence of a

tortious interference claim under Virginia law is that the

defendant intentionally induced the third party, in this case

Otto, to breach or terminate the relationship or expectancy with

the plaintiff.  Id. ("[T]he [plaintiff] Club must show . . .

that . . . the [third party] corporation . . . was induced by

[defendants] the Bennetts to breach the contract between the

_____

tortious interference "where the plaintiff can prove that the .
. . actions were illegal or fell so far outside the accepted
practice of that 'rough-and-tumble world' as to constitute
improper methods."  Alldredge, 710 S.E.2d at 722.  There is no
evidence in the record to support the proposition that
Defendants acted so far outside the accepted practice of the
competitive marketplace to constitute improper methods.
Accordingly, Stradtman's claim also fails on this alternative
basis.

[plaintiff] Club and the [third party] corporation."). Indeed,

in Chaves v. Johnson, the Supreme Court of Virginia referenced

the Restatement section entitled "Intentional Interference with

Performance of Contract by Third Party," and ultimately held

that liability attaches for "inducing or otherwise causing the

third person not to perform the contract." Chaves, 335 S.E.2d

at 102 (quoting Restatement (Second) of Torts § 766 (1977))

(emphasis added). Here, quite simply, there is no evidence that

Otto--the third party contracting with Stradtman--breached or

terminated his at-will employment contract. Instead, it is

undisputed that Stradtman[7] voluntarily resigned after Mr. Otto

and Mr. Muller initially wanted him to stay in his position.

(See SOF ¶¶ 65-67 (citing Stradtman Dep. at 203 ("Quite the

opposite. . . . They preferred that I stay.").) Accordingly,

because it is undisputed that third party Otto did not breach or

terminate the contract with Stradtman, his tortious interference

claim fails as a matter of law.

---

[7] Stradtman cites the Virginia Model Jury Instructions for the
proposition that termination by a third party is not required.
(See Pl.'s Opp'n at 15-16 (citing Va. Civil Model Jury
Instruction 40.250).) This argument is unavailing. The Court
referenced the model instruction in adjudicating the motion to
dismiss in an effort to construe all facts and inferences in
Stradtman's favor. (See Mem. Op. at 13 ("[T]he Court is mindful
that dismissal pursuant to Rule 12(b)(6) is disfavored.").)
However, ultimately, the Court is primarily concerned with the
case authority cited as a basis for the model instruction, which
includes many of the Chaves-progeny cases already referenced
above.

## B. Stradtman Voluntarily Resigned

Relatedly, "[t]he most glaring problem with [Stradtman's] tortious interference claim is that he alone made the decision to resign from [Otto]." Taylor v. CNA Corp., 782 F. Supp. 2d 182, 204 (E.D. Va. 2010).  Stradtman's voluntary resignation from Otto breaks the chain of causation that is necessary to show a relation between the alleged interference and the supposed termination.  In holding that Stradtman's tortious interference claim fails because he voluntarily resigned from Otto, this Court joins numerous federal courts across the country.  See, e.g., Woodend v. Lenape Reg'l High Sch. Dist., 535 F. App'x 164, 167-68 (3d Cir. 2013) (holding tortious interference with contract claim failed where "the loss was caused by Woodend's voluntary resignation."); Falzone v. Licastro, No. 1:10cv2918, 2012 WL 711273, at *4 (N.D. Ohio Mar. 4, 2012) ("Voluntary resignation breaks the chain of causation that would have linked any alleged interference to the contract's breach.") (citation and internal alterations omitted); Geller v. Von Hagens, No. 8:10-cv-1688, 2010 WL 4867540, at *4 (M.D. Fla. Nov. 23, 2010) ("Defendants' point is well-taken that, having presented that his resignation was voluntary, Geller cannot now be allowed to maintain a cause of action for tortious interference with his contract."); Brescia v. Leff, No. 3:04cv1680, 2006 WL 3231433, at *6 (D. Conn. Nov.

7, 2006) (holding plaintiff's claim of tortious interference with contractual rights fails in part because of her voluntary resignation) (citation omitted); Thompson v. City of Columbus, No. C2-98-822, 2001 WL 1681129, at * 6 (S.D. Ohio Sept. 26, 2001) ("Plaintiff's tortious interference claims . . . fail as a matter of law for two reasons. First, plaintiff . . . voluntarily resigned from her employment."); Mart v. Dr. Pepper Co., 923 F. Supp. 1380, 1390 (D. Kan. 1996) ("Simply put, there is no evidence that Pepsi or Terrell interfered with or induced the breach of any such contract.  Plaintiff voluntarily resigned from her position.").

More importantly, this Court has previously held "[i]t is axiomatic that a plaintiff cannot sustain a claim of tortious interference with business expectancy when he willingly surrendered his right to those expectancies." CNA Corp., 782 F. Supp. 2d at 204.  Stradtman concedes--as he must--that it is undisputed he resigned from Otto.  (See SOF ¶¶ 63-64 (citing Resignation Letter).)  Stradtman attempts to argue, however, that Virginia law permits a tortious interference claim where the plaintiff voluntarily resigns.  The Court is not persuaded by this argument.

First, Stradtman's argument that a tortious interference claim can survive where he voluntarily resigns is crushed by the weight of federal authority cited above.  Second,

18

the only support Stradtman offers for this proposition is a case
from the Circuit Court for the City of Norfolk, where the state
trial court overruled a demurrer to a tortious interference
claim.  (See Pl.'s Opp'n at 16 (citing Wilson v. Modjadidi, No.
CL06-4670, 2008 WL 5539824, at *3 (Va. Cir. Ct. Jan. 23, 2008).)[8]
There, the plaintiff alleged that the defendant intended for the
plaintiff to resign, specifically threatened to force her
resignation, openly bragged about having caused her to lose
employment once she resigned, stating, "I did get rid of her."
Id.  This factual scenario is distinguishable from the facts of
this case.  There is no evidence in the record that Defendants
specifically threatened Otto to force Stradtman's resignation,
that they openly bragged about causing Stradtman to lose his
employment, or that they had anything remotely to do with
Stradtman's separation.  This argument instead blends into
Stradtman's final argument: that he was constructively
discharged from Otto and was left with no other option but to
voluntarily resign.  This theory, while questionable as a matter
of Virginia law,[9] ultimately fails because there is no evidence

---

[8] Stradtman also cites Judge Ellis' opinion in Taylor v. CNA
Corp., but this case is more properly addressed in the Court's
constructive discharge analysis, infra.
[9] This Court has previously held that Virginia does not recognize
the tort of wrongful constructive discharge for an at-will
employee.  Gordon v. ArmorGroup, N.A., No. 1:10cv2 (JCC), 2010
WL 3418219, at *4 (E.D. Va. Aug. 27, 2010).  However, for
purposes of this motion, the Court assumes without expressly

in the record that Otto constructively discharged Stradtman.

C. Constructive Discharge

Stradtman's tortious interference claim survived Defendants' motion to dismiss based on his theory that he was "constructively discharged" from Otto and that he was given no alternative but to resign. (Mem. Op. at 9-13.)  The Court concluded that Stradtman was entitled to discovery on this issue to determine "if conditions at [Otto] had become so intolerable that [Stradtman was] effectively left no practical choice other than quitting, [because] then it would be unfair to characterize his decision as willingly made." (Mem. Op. at 10 (quoting CNA Corp., 782 F. Supp. 2d at 204).)  After discovery, there is no support in the record for Stradtman's claim that he was constructively discharged from Otto.

Constructive discharge occurs in the employment discrimination context when an employer deliberately makes the

holding that in certain instances, an at-will employee can predicate a tortious interference claim on an alleged constructive discharge.  See CNA Corp., 782 F. Supp. 2d at 204 ("[I]f conditions . . . had become so intolerable that [the employee was] effectively left no practical choice other than quitting, then it would be unfair to characterize his decision as willingly made."); see also Gordon, 2010 WL 3418219, at *5 ("[T]his Court has allowed an at-will employee/plaintiff to predicate a False Claims Act claim on an alleged constructive discharge.") (citations omitted).  Because the undisputed facts of this case do not support a claim for constructive discharge, however, the Court need not expressly rule on this legal issue, as it remains unaddressed by the Supreme Court of Virginia. Gordon, 2010 WL 3418219, at *4 n.3.

working conditions of the employee so intolerable in an effort to induce the employee to quit or force the employee into involuntary resignation.  Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1353-54 (4th Cir. 1995) (citing Bristow v. The Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985); Ugalde v. W.A. McKenzie Asphalt Co., 990 F.2d 239, 242-43 (5th Cir. 1993)).

Here, first, the working conditions at Otto cannot be described as "so intolerable."  Stradtman had just negotiated a $270,000 bonus for himself, and his superiors asked him to stay. Quite contrary to Stradtman's "beliefs" and argument here, not only were these conditions tolerable by objective standards, a reasonable person might even call them desirable.  See Byers v. HSBC Fin. Corp., 416 F. Supp. 2d 424, 441-42 (E.D. Va. 2006) ("Intolerability is judged by an objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign.") (citing Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985)).  Indeed, if these facts supported a finding of "intolerable" working conditions, this Court would turn the law of constructive discharge on its head. See, e.g., Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.") (citation omitted).

21

Second, Stradtman has admitted that Otto did not intend to force his resignation, and there is no legal support for the proposition that Defendants could have intended to constructively discharge Stradtman.  (Defs.' SOF ¶¶ 65-67 (citing Stradtman Dep. at 203 ("Quite the opposite. . . . They preferred that I stay."); id. at 215, 353-54); Pl.'s SOF ¶¶ 65-67 (citing Stradtman Dep. at 393 ("Q: And there's no question Mr. Muller and Mr. Otto asked you to stay with Otto, notwithstanding your presentations in writing and orally about the problems in the east region?  A: So Mr. Otto asked me to stay.  Luc said he understood there was no good choice.  Q: All right. But Mr. Otto was the final say in that discussion, I take it?  A: Well, I was the final say."))).)  In short, first, Otto wanted him to stay.  (See Muller Decl. ¶ 21 ("I told him that I would not terminate his employment, because what was best for the Company, was that he stay as CEO.").)  Second, there is no legal basis for the proposition that Defendants' actions could have somehow resulted in Stradtman's constructive discharge; instead, Otto's "actions" are the only relevant consideration for the Court.  See Martin, 48 F.3d at 1354 ("[I]n order to demonstrate constructive discharge, a plaintiff must allege and prove two elements: (1) deliberateness of the employer's actions and (2) intolerability of the working conditions.") (citation and internal quotation marks omitted and emphasis added).  The

Court noted at the motion to dismiss stage that this theory was threadbare, and now on summary judgment the record confirms the Court's previous suspicion.

Third, the undisputed facts of this case are also not supported by this Court's opinion in Taylor v. CNA Corp., where the Court hypothesized about a factual scenario in which it "would be unfair to characterize [an employee's] decision as willingly made," where the employee had "no practical choice other than quitting." 782 F. Supp. 2d at 204. This is not such a case. The undisputed material facts show that this is a case where Stradtman voluntarily resigned in the face of other choices. For one, he could have stayed at Otto, as initially requested by Mr. Muller. More importantly, the Court rejects Stradtman's theory that he had a fiduciary duty to resign. Stradtman argues that he owed a duty of good faith and loyalty to Otto, and that he "was entitled to consider all factors which might be implicated, including the best interests of Otto's employees, and the realistic threat of harm to Otto's finances if orders from Republic continued to drop." (Pl.'s Opp'n at 33 (citing Feddeman & Co. v. Langan Assocs., 530 S.E.2d 668, 673 (Va. 2000); Willard ex rel. Moneta Bldg. Supply v. Moneta Bldg. Supply, 50 Va. Cir. 558, 575-76 (Va. Cir. Ct. 1998)).) Even if the Court accepts Stradtman's initial premise that he had a fiduciary duty as stated above, Stradtman's argument fails

because it is undisputed that there was no "realistic threat of harm to Otto's finances."

"One of the most basic tenets of Delaware corporate law is that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation." Online Res. Corp. v. Lawlor, 736 S.E.2d 886, 900 (Va. 2013) (McClanahan, J., concurring in part and dissenting in part) (quoting Quickturn Design Sys., Inc. v. Shapiro, 721 A.2d 1281, 1291 (Del. 1998)).  Ultimately, "the Board of Directors controls the company, not the CEO." Lawlor, 736 S.E. 2d at 900 (citing Del. Code. Ann. tit. 8, § 141(a)).  However, corporate officers, including the CEO, nonetheless owe the "duties of 'utmost good faith' and loyalty to his corporation." Office of Strategic Servs., Inc. v. Sadeghian, 528 F. App'x 336, 343 (4th Cir. 2013) (citing Feddeman & Co. v. Langan Assocs., 530 S.E.2d 668, 673 (Va. 2003)).  Stated differently, the CEO must disclose conflicts of interest "and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of [the corporation]." Today Homes, Inc. v. Williams, 634 S.E.2d 737, 743 (Va. 2006) (quoting Rowland v. Kable, 6 S.E.2d 633, 642 (Va. 1940)).

Here, Stradtman disclosed to Otto his belief that Defendants were intentionally diverting business away from Otto

24

in retaliation for his wife's discrimination lawsuit.  His fiduciary duty to Otto obligated such disclosure, especially if he believed that it subjected him to conflicting duties. Stradtman's claim fails, however, because he has conceded that Otto did not want him to resign, even when it was aware of and knew of the alleged "threat" regarding diverted business in the East Region of Republic.  (SOF ¶¶ 51-52 (citing Muller Decl. ¶ 14 ("I didn't think, assuming what he was telling me was accurate, that our business was actually being significantly harmed.  In fact, I told Mr. Stradtman that in the context of our overall and long term relationship with Republic Services, the issues he was raising were not that significant, and certainly did not require him to resign.") (emphasis added); SOF ¶¶ 65-67; Muller Decl. ¶ 25 ("From our perspective, Republic Services did not force Mr. Stradtman to resign, and Otto certainly did not want him to resign.").)  Not only did fellow board member Luc Miller not want Stradtman to resign, he wanted him to stay "because [it] was best for the Company . . . that he stay as CEO."  (Muller Decl. ¶ 21.)  Stradtman scours the record in an attempt to find support for his belief that continuing as CEO of Otto realistically harmed and posed a threat to the best interests of Otto--but any attempt is doomed by Mr. Muller's concession that these issues, no matter how they are framed by Stradtman (see Pl.'s Opp'n at 25-27), were not significant to

Otto, did not implicate any fiduciary duty, and did not require Stradtman to resign.  Clearly, Stradtman disagreed with Otto and voluntarily resigned from the company anyway.  But this decision certainly was not required or compelled by any fiduciary duty he owed to Otto.  <u>Lawlor</u>, 736 S.E. 2d at 900.

Instead, the record is clear that Stradtman executed a calculated, years-long scheme in an attempt to cast liability on Defendants for actions he willingly took.  These actions, in the Court's view, show Stradtman was motivated by self-interest, and took every opportunity to maximize his own personal gain.

First, unbeknownst to Otto management, Stradtman set out in early January of 2012 (if not earlier) to find another CEO position.  He re-posted his resume on a recruiter website, spoke with recruiters, went through the interview process, and engaged in negotiations with another company.  He did not disclose these efforts, and ultimately, he accepted the CEO position with PSI, still without informing anyone at Otto.

Second, only four days after PSI offered him the CEO position, Stradtman negotiated a $270,000 payment from Otto. Label this payment however you want.  During his negotiations with Mr. Muller regarding the payment, Stradtman <u>never</u> alerted him to the fact that he was actively seeking other employment, or that PSI had already offered him the CEO position.

Third, after accepting the CEO position with PSI and negotiating the $270,000 payment from Otto, Stradtman now needed to create the illusion that he was being forced to resign from Otto, in Otto's "best interests," because of alleged improper methods employed by Republic to divert business from Otto.  He even told his attorney: "I will need to try to force my termination between March 28 and April 1, roughly, in order to try to receive severance to support me with my new lower salary."[10]  Taylor's discrimination lawsuit had now been pending against Defendants for over six months, and Stradtman seized this opportunity to cite "diverted business" as a reason for his departure from Otto.  In reality, just a month or two earlier, in his quarterly report to Otto, Stradtman never mentioned any diverted business from Republic.  And when confronted with "the issue," Mr. Otto and Mr. Muller were not concerned with any cancelled or redirected orders from Republic in the East Region, and instead wanted Stradtman to remain as Otto's CEO, which was in the best interest of the company.

---

[10] There is also evidence in the record that Stradtman and his attorney knew his claim was not likely to succeed, given the facts and circumstances of this case, no matter the forum.  (See Defs.' Reply Ex. A [Dkt. 170-1] at 3 ("I think Steve's biggest hurdle is going to be that he quit and whether that resignation was forced.  Otto will likely testify that they wanted him to stay . . . . Given the Fairfax Court -- and the lack of any confidence in it -- I am just trying to get the issue prepped for an appeal in state court -- and it looks like we might have to rely on federal law for that.").)

But Stradtman could not turn back now.  He had already accepted another CEO position with PSI, negotiated a sizable payment from Otto, and told his attorney that he would need to force his termination from Otto during a specific timeframe to maximize severance benefits from Otto.  Ultimately, the undisputed facts show that: (1) Otto did not terminate Stradtman's employment; (2) Stradtman voluntarily resigned from Otto; and (3) Stradtman was not constructively discharged or forced to resign.  Instead, Stradtman's voluntary resignation was part of his own grand design to accept another CEO position, maximize his own monetary return from Otto, and "tee up" a lawsuit against Defendants.  With no material facts in dispute that require the efforts of a jury, Defendants are entitled to judgment as a matter of law.

## IV. Conclusion

For the foregoing reasons, the Court granted Defendants' motion for summary judgment.

An appropriate Order shall issue.

/s/
_____
June 11, 2015                    James C. Cacheris
Alexandria, Virginia      UNITED STATES DISTRICT COURT JUDGE