**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | | |
|---|---|---|
| STEPHEN M. STRADTMAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | CA 1:14cv1289 (JCC/JFA) |
| REPUBLIC SERVICES, INC., *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION FOR ATTORNEYS' FEES AND COSTS

Pursuant to 28 U.S.C. Section 1927, Federal Rule of Civil Procedure 54, and the Court's inherent authority, Defendants Republic Services, Inc., Republic Services of Virginia, LLC and Ronald Krall (collectively, the "Defendants"), by their counsel, respectfully submit this Motion for Attorneys' Fees and Costs (the "Motion") from Plaintiff Stephen M. Stradtman ("Stradtman" or "Plaintiff"), Plaintiff's counsel Carla Brown, Esq., and Charlson Bredehoft Cohen Brown & Jones, P.C. (Ms. Brown and her firm are collectively referred to as "CBCBJ").

Defendants seek fees and costs because Plaintiff and his counsel brought and continued to litigate this case long after they must have known that there was no good faith basis to do so. As the Court found on summary judgment, "***the record is clear that Stradtman executed a calculated, years long scheme in an attempt to cast liability on Defendants for actions he willfully took.***" Memorandum Opinion at 26 (emphasis added). Plaintiff's and his counsel's perpetuation of this scheme forced Defendants to incur many hundreds of thousands of dollars in

fees and costs before Defendants were finally able to uncover the truth. Defendants seek to recover a substantial portion of these fees and costs against Plaintiff and his counsel.

I.      **Plaintiff And CBCBJ Knew There Was Never A Legitimate Claim, And Plaintiff Engaged In A Years Long Scheme To Foist Liability On Defendants.**

On June 11, 2015, this Court issued its Memorandum Opinion[1] granting the Defendants' Motion for Summary Judgment as to Plaintiff's claim that the Defendants tortiously interfered with his former employment as the Chief Executive Officer ("CEO") of Otto Industries North America, Inc. ("Otto"). The Court rejected Stradtman's tortious interference claim because the undisputed evidence developed through discovery made it clear that there is not and never was a legitimate basis for that claim. The record on summary judgment, and additional evidence obtained through discovery, demonstrate that Stradtman and CBCBJ long knew: a) that Defendants did not induce Otto to terminate his employment contract or force Stradtman's resignation; b) that Stradtman voluntarily resigned; c) that Stradtman's working conditions at Otto were not intolerable; d) that Stradtman's voluntary actions were part of a scheme to obtain money from Otto and manufacture a claim against Defendants; and e) that there was no factual support for many of the allegations of retaliation made against Defendants in Plaintiff's Complaint.

A. *Stradtman And CBCBJ Knew That Defendants Did Not Induce Otto To Terminate Stradtman's Employment Or Force Stradtman's Resignation*

In ruling on summary judgment, this Court found that the undisputed facts showed that Defendants did not induce a third party, *i.e.*, Otto, to terminate his employment contract, as required by the Virginia Supreme Court's decisions in *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985) and *Rappahannock Pistol & Rifle Club, Inc. v. Bennett,* 546 S.E.2d 440, 444 (Va.

---

[1]      The Court's Memorandum Opinion and Order are attached hereto as Exhibit A.

2001). Memorandum Opinion at 16. Nor did Defendants induce Otto to force him to resign. As the Court noted, "it is undisputed that Stradtman voluntarily resigned and Mr. Muller (CEO of Otto and Otto board member) initially wanted him to stay in his position." *Id.* Furthermore, the Court found that Stradtman admitted that Otto never intended to force his resignation. *Id.* at 22 (citing SOF ¶¶ 65-67 and Plaintiff's SOF ¶¶ 65-67).[2] Accordingly, there was "no legal support for the proposition" on which Plaintiff's whole case was based—and on which he was allowed to proceed to discovery—that "Defendants . . . intended to constructively discharge Stradtman."[3] *Id.* Knowing that they lacked the basic, predicate elements for their tortious interference claim, Stradtman and his counsel should never have pursued a constructive discharge theory; at the very least, they should have come clean and admitted, from the get-go, that Otto neither terminated nor forced Stradtman to resign.[4]

---

[2] During the hearing on the motion to dismiss, CBCBJ had argued that "… I don't think it's a fair reading or a fair inference from the complaints that Otto intended to have Mr. Stradtman remain there. In fact, I think there's going to be a significant factual dispute about that that makes it not right for disposition on a 12(b)(6)." Nov. 20, 2014 Hearing Transcript (attached hereto as Exhibit M) at 14:5-9. There never was a reasonable basis for this assertion. Memorandum Opinion at 16 (citing to SOF ¶¶ 65-67 and Stradtman dep. testimony (Exhibit E hereto) at 203 ("Quite the opposite … They preferred that I stay."). CBCBJ cannot plead ignorance of the true facts: in an email to CBCBJ discussing a draft complaint Stradtman specifically stated that "my board wanted me to stay." Exhibit B to Reply Brief for Motion for Summary Judgment (Docket No. 170).

[3] Also, CBCBJ argued during the motion to dismiss hearing that Republic "had every intention of punishing Mr. Stradtman, including running him out of his job, which is effectively what occurred." Exhibit M at 15-16. But in his deposition Stradtman acknowledged that Republic Services did not intend to force him to resign from Otto. SOF ¶ 68 (Docket No. 143) & Plaintiff's SOF ¶ 68 (Docket No. 164).

[4] Moreover, by summary judgment Stradtman abandoned the allegations that Republic breached its contract with Otto by failing to purchase carts. Plaintiff's opposition to the motion to dismiss cites numerous Complaint paragraphs and states that "Republic and Mr. Krall began to withhold business from Otto, breaching Republic's contract with Otto by redirecting orders to higher-priced competitors, failing to fulfill order requirements, and cancelling orders." Docket No. 10 at 3. However, it was undisputed that in reality the agreement between Republic and Otto "expressly stated that Republic Services was not required to purchase any minimum quantity or volume of goods or services from Otto" and that the agreement provided that Republic "would

### B. Stradtman And CBCBJ Knew That Stradtman Voluntarily Resigned From Otto

This Court further found that "[t]he undisputed material facts show that this is a case where Stradtman voluntarily resigned in the face of other choices." Memorandum Opinion at 23. Indeed, Stradtman himself specifically *admitted* in response to Defendants' Summary Judgment Motion that he voluntarily resigned, without even attempting to qualify or explain that admission. SOF ¶ 63 (Docket No. 143) and Plaintiff's SOF, ¶ 63 (Docket No. 164). Relying upon this Court's prior precedent in *Taylor v. CNA Corp.,* 782 F.Supp.2d 182, 204 (E.D. Va. 2010), and numerous other federal court decisions, this Court reasoned that "Stradtman's voluntary resignation breaks the causal chain between any supposed interference by Defendants and the termination of his employment with Otto." Memorandum Opinion at 12. Although Stradtman had argued that Virginia law permits a tortious interference claim where a plaintiff voluntarily resigns, this Court found that Stradtman's argument "is crushed by the weight of federal authority" to the contrary, and the only legal support Stradtman offered for his position was a Virginia Circuit Court decision whose facts were inapposite to those at hand. *Id.* (citing *Wilson v. Modjadidi,* No. CL06-4670, 2008 WL 5539824, *3 (Va. Cir. Ct. Jan. 23, 2008)). Stradtman and his counsel knew all along that his resignation was truly voluntary. As a result, they lacked a good faith basis to bring a tortious interference claim in the first place. At the very least, Plaintiff should have been up front in his complaint and admitted that his resignation was

---

extend the term of the agreement by one year if, as of December 31, 2015, its cart purchases had not averaged at least 70% of its average purchases in the 3 years prior to the new agreement or 1,050,000 carts per year." SOF ¶ 6 (Docket No. 143); Plaintiff's SOF ¶6 (Docket No. 164). Had Plaintiff been straight forward it would have been clear during the motion to dismiss that the contract did not require a minimum purchase and the remedy for failing to purchase carts was the addition of another year (to be determined at the end of this calendar year). Accordingly, there was never a basis for asserting that Republic was in breach of contract.

voluntary.[5]  Had he done so, the Court could have decided the legal question of whether such an admission barred his claim, without forcing Defendants to participate in the lengthy discovery necessary to wring such an admission out of Plaintiff.

>    ### C. There Was Never Support For A Constructive Discharge Claim Because The Working Conditions At Otto Were Not Intolerable.

Although "Stradtman scour[ed] the record," this Court concluded that "there is no support in the record for Stradtman's claim that he was constructively discharged from Otto." Memorandum Opinion at 20 & 26.   Rather, as Stradtman and his counsel always knew, the opposite was true:   Otto wanted Stradtman to stay in his position and provided him with monetary inducements to do so.  The evidence was clear that, prior to his resignation, "Stradtman had just negotiated a $270,000 bonus for himself, and his superiors asked him to stay." *Id.* at 20. In fact, it was undisputed that Stradtman admitted that Otto did nothing to make him leave his job or make his ability to act as CEO unbearable.  SOF ¶ 66 (Docket No. 143); Plaintiff's SOF ¶ 66 (Docket No. 164); Exhibit E (Stradtman Depo.) at 215:5-14.[6]  Accordingly, "not only were these conditions tolerable by objective standards," the Court properly opined that "a reasonable person might even call them desirable. If these facts supported a finding of 'intolerable' working conditions, this Court would turn the law of constructive discharge on its head." *Id.* at 21 (citations omitted).[7]

---

[5]     Indeed, at the motion to dismiss hearing CBCBJ went even further and asserted without support that Stradtman's resignation was not voluntary because "the defendants made it not only intolerable but *illegal* for Mr. Stradtman to remain in his position."  Exhibit M at 15 (emphasis added).

[6]     ("Q: Was Otto - - Mr. Otto or the company, through Otto or Mr. Muller [sic] or anybody, were they making your ability to act as CEO unbearable, I guess, for lack of a better word?  A: No.  Q: Can you say anything negative about what Mr. Otto or what Mr. Muller [sic] did to you in this - - the first half of 2012 that would make you leave your job?  A: Oh, no.")

[7]     This Court also rejected Stradtman's theory that he had a fiduciary duty to resign because the facts were undisputed that there was "no 'realistic threat of harm to Otto's finances,'" and Stradtman fulfilled whatever duty he had by disclosing to Otto his belief that "Defendants were

### D. Stradtman Engaged In A Scheme To Obtain Additional Compensation From Otto And Manufacture A Claim Against Defendants.

There is not merely an absence of evidence to support Plaintiff's claim, but also clear evidence that his claim was fabricated from the beginning. As the Court observed, "***the record is clear that Stradtman executed a calculated, years long scheme in an attempt to cast liability on Defendants for actions he willfully took.***"  Memorandum Opinion at 26 (emphasis added).[8] These actions "show Stradtman was motivated by self-interest, and took every opportunity to maximize his own personal gain" in three respects.

First, unbeknownst to Otto management, in early January, 2012 (if not earlier) Stradtman took steps to find another CEO position, and he ultimately accepted the CEO position with his new employer, PSI, "still without informing anyone at Otto." *Id.* at 26.

"Second, only four days after PSI offered Stradtman the CEO position, Stradtman negotiated a $270,000 payment from Otto." *Id.*  As the evidence and this Court's findings made clear: "[l]abel this payment whatever you want. During his negotiations with Mr. Muller [of Otto] regarding the payment, Stradtman <u>never</u> alerted him to the fact that he was actively seeking other employment, or that PSI had offered him the CEO position." *Id*. (emphasis in original).

Third, "after accepting the CEO position with PSI and negotiating the $270,000 payment from Otto," the undisputed evidence showed that  Stradtman "now needed to create the illusion

---

intentionally diverting business away from Otto in retaliation for his wife's discrimination lawsuit." Memorandum Opinion at 24-25. (emphasis in original).

[8]     The Court also noted that "[a]t the motion to dismiss stage," the Court found Stradtman's constructive discharge theory to be "threadbare, and now on summary judgment the record confirms the Court's previous suspicion." *Id.* at 22-23.  Of course, Stradtman and CBCBJ were aware of all of these facts at that time they filed suit and knew that the claim had no merit. Stradtman's and his counsels' actions from that point forward imposed enormous costs and expenditures of time upon Defendants, requiring them to discover the factually unfounded premises asserted in the Complaint and offering a Hobson's choice of paying Stradtman significant money to settle a frivolous claim or incurring substantial and unnecessary costs to bring the case to summary judgment. Given such a choice, justice dictated that Defendants follow the latter path.

that he was being forced to resign from Otto . . . because of alleged improper methods employed by Republic to divert business from Otto." *Id.* at 27. Accordingly, Stradtman told CBCBJ that he would "***need to try to force my termination*** . . . in order to try to receive severance to support me in my new lower salary.'" *Id.* (emphasis added).[9] This was Stradtman's plan even though, as the Court pointed out, "there is . . . evidence in the record that Stradtman and his attorney knew his claim was not likely to succeed, given the facts and circumstances of this case, no matter the forum." Memorandum Opinion at n. 10. But "Stradtman could not turn back now. He had already accepted another CEO position with PSI, negotiated a sizable payment from Otto, and told his attorney that he would need to force his termination from Otto during a specific time frame to maximize severance benefits from Otto." *Id.* at 28. In sum, "***Stradtman's voluntary resignation was part of his own grand design to accept another CEO position, maximize his own monetary return from Otto, and 'tee up' a lawsuit against the Defendants***" that this Court properly found was without any legal or factual basis. *Id.* (emphasis added).

In addition to the evidence previously submitted in support of Defendants' Motion for Summary Judgment, there is additional evidence obtained through discovery that supports the conclusion that Plaintiff and CBCBJ engaged in a concerted effort to manufacture and "'tee up' this lawsuit against the Defendants." *Id.* at 28.

For example, on April 23, 2012, after Stradtman had already received a $270,000 bonus from Otto and accepted another job without telling Otto, Stradtman sent his wife, Jennifer Taylor, an email in which he referred to his attempt to **"trap"** Republic's Procurement manager,

---

[9]     The March 22, 2012 email from Stradtman to his counsel discussed in the Court's Memorandum Opinion is Exhibit 17 to the memorandum in support of Defendants' Summary Judgment Motion (Docket No. 143). It is re-attached here as Exhibit B.

Tom Piersa, into making a damaging statement that could be used at trial. Exhibit C hereto. Specifically, Stradtman states:

> "***I think Tom stepped into my trap.*** *After our call he had to come back to me. He could either come back and say there was nothing going on, which I could question, or he could say there was something going on which would have been suicide. See below how mice [sic] he was and see my next response to see if he can now put up or shut up. whats [sic] your prediction?*"

Exhibit C (emphasis added).[10]

In addition, Defendants learned during discovery that Stradtman drafted and then revised various versions of a pre-complaint email on March 11 and March 12, 2012 to his counsel at CBCBJ in which he sought advice as to how he should go about setting up one of the Defendants—Ron Krall—to improve his claim that Republic was using its position as an Otto customer to retaliate against Stradtman's wife. These emails state: "[this] is the email I would like to send to Ron Krall [at Republic] to accomplish a few objectives which I think could be effective. **I am trying to link his behavior to the issue at hand. I am certainly open to your comments**." Exhibit D (emphasis added). Immediately thereafter, CBCBJ provided comments to Stradtman on his draft email and authorized him to send it. This was during the precise time period when Stradtman, with the knowledge of CBCBJ, created his "force my termination" email, which revealed his true plan and motivations. Exhibit B.

---

[10] The "trap" email was the subject of motions practice before Judge Anderson. CBCBJ was aware of the "trap" email and sought to prevent its production to Defendants by redacting the email in its document production, even after Stradtman waived the marital privilege in a hearing before Judge Anderson.

E. *Through Discovery Defendants Have Learned That Plaintiff and His Counsel Never Had Any Factual Basis For A Number Of Allegations In The Complaint About Republic's Conduct.*

Not only did Stradtman never have a factual or legal basis for his constructive discharge claim, discovery proved that there never was a basis for many of the other allegations made by Stradtman about Republic's conduct. For example, Plaintiff did not have any factual basis for his allegation that when asked about alleged diverted orders from Otto, Republic employees responded by asking "who at Otto is married to Jennifer Taylor?"— an allegation critical to Stradtman's attempt to "link" the alleged diverted orders with his wife's discrimination case. Complaint at ¶ 83. Stradtman had no first-hand knowledge of any such statement. He testified that he heard it from his VP of Sales Tim Phanco, who had heard it from Sam Smith or Scott Smith. (Stradtman Depo. at 247:17 – 248:3 – attached as Exhibit E hereto). But in an April 22, 2015 email, Stradtman's attorney acknowledged that Sam Smith would not verify that the "Who at Otto is married to Jennifer Taylor?" statement was made to him. Exhibit F (AOL005284). What good faith basis did Stradtman have for making this allegation in his Complaint? The answer is clear: none.

Stradtman and his counsel included other statements in the Complaint that were also wholly unverified and were, at best, triple or quadruple hearsay. For example, the Complaint affirmatively alleges without qualification that a Republic sales manager stated that Otto was being taught a lesson. Complaint at ¶ 89. However, when he was finally deposed on this allegation, Stradtman had to admit that he heard about this alleged statement third or fourth hand from Tim Phanco, who reportedly heard about the statement from L.T. Beale, an Otto employee. Exhibit E (Stradtman Depo., at 248:4-15 & 249:7-20). Stradtman was forced to admit that he never spoke directly to Mr. Beale to verify the allegation. Exhibit E (Stradtman Depo., at 249:3-5). Mr. Phanco also testified that he did not hear the purported admission from Mr. Beale and

had never actually spoken to him about it. Exhibit G (Depo. Tim Phanco at 116:5-15). Instead, he testified that he had heard the purported statement third hand through another source. *Id.* As far as we can tell, no diligence was undertaken to verify that this critical allegation was actually true—or at least that there was a witness who would testify to it.

## II. An Award Of Attorneys' Fees And Costs Is Warranted Under The Court's Inherent Authority and 28 U.S.C. §1927.

Based upon the above evidence in the record and this Court's findings of fact and law in the Summary Judgment Memorandum Opinion, an award of attorneys' fees and costs is warranted and indeed required in this case.

It is well established that courts have the inherent power to impose sanctions on a party or its counsel for bad faith conduct that offends or abuses the legal process. *Chambers v. NASCO,* 501 U.S. 32, 50 (1991); *Finn v. Schiller*, 72 F.3d 1182, 1190 (4th Cir. 1996); *Suntrust Mortgage, Inc. v. AIG United Guaranty Corp.,* 2011 U.S. Dist. Lexis 33118 at *42-43 (E.D.Va. 2011). Abuse of the judicial process takes many forms, including, "the commencement or continuation of litigation in bad faith" or conducting litigation "in bad faith, vexatiously, wantonly or for oppressive reasons." *Id.* (quoting *Chambers v. NASCO,* 501 U.S. 32, 46 (1991). This is a textbook case for the exercise of the court's inherent authority to impose sanctions. The fact that Plaintiff and his counsel had no good faith basis for their factual allegations and that the entire complaint was part of a "calculated, years-long scheme in an attempt to cast liability on Defendants for actions [Stradtman] willingly took" is more than enough to establish the state of mind necessary to impose sanctions. In addition, the financial consequences to Defendants of the decision Plaintiff and his counsel made to pursue their scheme were immense, requiring Defendants who were, after all facing claims for $50 million, to spend over $1,000,000.00 to debunk Plaintiff's claims. As a direct consequence of Plaintiff and Plaintiff's counsels' actions,

Defendants were required to engage in extensive document production, collect and search hundreds of gigabytes of electronically stored information from numerous custodians, take numerous depositions in multiple locations, including Virginia, Arizona, South Carolina, Ohio, New York, Pennsylvania, and Canada, and engage in repeated and time consuming motions practice before this Court in order to pry loose the documents that evidence Plaintiff's scheme.

Counsel for a party can also be held personally liable for attorneys' fees and expenses pursuant to Section 1927, which states:

> [A]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. §1927. In an extensive decision analyzing current Fourth Circuit case law, this Court has specifically found that bad faith is not required to award attorneys' fees under Section 1927. *Sanford v. Commonwealth of Virginia*, 689 F.Supp. 2d 802 (E.D.Va 2010). But even if a finding of bad faith were required,[11] an award of attorneys' fees and expenses is warranted under Section 1927 because bad faith is certainly present in this case. At a minimum, there can be little question that Stradtman's counsel unreasonably and vexatiously multiplied the proceedings in this case.

CBCBJ's unfounded attempt to recover for Stradtman on the theory that Republic retaliated against Taylor by cancelling orders from Otto began long before this lawsuit was filed. CBCBJ first sought damages on Stradtman's behalf in his wife Jennifer Taylor's lawsuit by filing an unprecedented, and legally unsupportable, associational retaliation claim. When that claim was finally brought before Judge Lee on summary judgment, it was rejected, with Judge

---

[11] Some earlier case law suggests that a finding of bad faith is required. *See, Chaudhry v. Gallerizzo*, 174 F.3d 394, 411 n14 (4th Cir. 1999); *In re Gould,* 77 Fed. Appx. 155, 161 (4th Cir. 2003).

Lee ruling that, as a matter of law, Taylor could not "assert a retaliation claim based on Republic's alleged business dealings with her husband's employer." Case No. 12: cv-00523, D.I. No. 213 (Exhibit H) at 18. Undaunted, CBCBJ then filed an action on behalf of Stradtman against Defendants in the United States District Court for the District of Columbia[12], which CBCBJ voluntarily dismissed after Defendants were required to file a motion to dismiss under Fed. R. Civ. P. 12. Subsequently, CBCBJ filed this action in which Defendants were forced to engage in extensive motions and discovery practice to prove what CBCBJ knew from the beginning – that Stradtman's claim had no factual or legal merit.[13] Having lost twice in other courts and having no factual basis for Stradtman's claims, CBCBJ multiplied the proceedings unreasonably and vexatiously by bringing and then pursuing this case through discovery and summary judgment.

Courts routinely award sanctions based upon frivolous claims under both Section 1927 and the court's inherent authority. *Salvin v. American Nat. Ins. Co.,* 281 Fed. App. 222, 225-27 (4th Cir. 2008) (unreported) (upholding district court sanctions finding against plaintiff's attorney because plaintiff's attorney had notice that claim was meritless following plaintiff's deposition yet did not dismiss action); *Blair v. Shenandoah Women's Center, Inc.,* 757 F.2d 1435, 1436-1438 (4th Cir. 1985) (upholding district court sanctions finding made against attorney that brought frivolous claims on behalf of client); *Blue v. U.S. Dept. of Army*, 914 F.2d 525, 550 (4th

---

[12] Case No. 12-cv-01593 (D.D.C. 9/25/12)

[13] The motions practice, discovery, and summary judgment motion in this case alone meets the multiplication requirement. The Fourth Circuit has explained that refusing to voluntarily dismiss a case once the lack of merit was evident meets Section 1927's multiplication of proceedings requirement because defendants are forced to continue with discovery obligations and continue through to summary judgment. *Salvin v. American Nat. Ins. Co.,* 281 Fed. App. at 227 (4th Cir. 2008) (unreported).

Cir. 1990) (same); *Reichmann v. Neumann,* 553 F.Supp.2d 307, 319-327 (S.D.NY 2008) (imposing sanctions under Section 1927 and inherent authority and finding that bad faith existed because there was never a colorable claim and counsel violated duty to court by not investigating truth of allegations). Finally, the Fourth Circuit has noted that "there is nothing novel in recognizing that an attorney can face sanctions 'for pursuing a case after it becomes clear that the case is without merit.'" *Salvin v. American Nat. Ins. Co.,* 281 Fed. App. At 227 (4th Cir. 2008) (unreported) (quoting "*Blue v. U.S. Dept. of Army*, 914 F.2d at 537 (4th Cir. 1990)). In this case, there was never a colorable claim, and sanctions are appropriate.

As this Court noted in its recent Memorandum Opinion on Summary Judgment, it is clear that "[t]here is also evidence in the record that Stradtman and his attorney knew his claim was not likely to succeed, given the facts and circumstances of this case, no matter the forum." Memorandum Opinion at n. 10.[14] It is worth repeating that CBCBJ was well-aware of all of the underlying facts that this Court relied upon in its Memorandum Opinion granting summary judgment, including but not limited to the fact that Stradtman was negotiating a new job with PSI that he accepted without Otto's knowledge, that he accepted a $270,000 payment from Otto, and that he was not constructively discharged but actually was asked to stay in his position with Otto.[15] Furthermore, CBCBJ was well aware of the additional evidence referenced above that shows that Stradtman never had any factual or legal basis for his claims against Defendants. For

---

[14]     Citing Defendants' Summary Judgment Reply Exhibit A (Docket No. 170-1) at 3 ("I think Steve's biggest hurdle is going to be that he quit and whether that resignation was forced. Otto will likely testify that they wanted him to stay…. Given the Fairfax Court -- and the lack of any confidence in it -- I am just trying to get the issue prepped for an appeal in state court -- and it looks like we might have to rely on federal law for that.").

[15]     Defendants devoted significant resources to defend Stradtman's claims both in the *Taylor* and the District of Columbia actions, even though, as this Court has found, those claims were baseless. Defendants, however, are not seeking in this motion to recover their attorney's fees and costs for defending the equally spurious allegations made in those cases.

example, before this lawsuit was filed: (1) Stradtman had sent a draft of his "force my termination" email to CBCBJ in March, 2012; (2) Stradtman had sent a draft of his email where he admitted that he was trying to create a "linkage" between Defendant Ron Krall and his allegations; and (3) CBCBJ was fully aware of the "trap" email in which Stradtman described how he was attempting to manufacture this very lawsuit. Despite CBCBJ's actual knowledge of the facts, during the motion to dismiss hearing CBCBJ asserted without any support whatsoever that:

> [Stradtman] knew the only way that he could salvage the situation at Otto was for him to leave, and for him to remain would have been illegal, possibly exposing him to criminal liability, exposing him to potential civil liability. And the situation that we've alleged for Steve Stradtman is far more severe than any case that's before this court. There is no other case where a plaintiff in order to continue with the contract would have engaged in illegal conduct, would have breached his fiduciary duties, would have gained financially for himself at the expense of the company.

Exhibit M at 16. There was never the slightest factual basis for this assertion. Instead, the record is clear that CBCBJ worked "hand in glove" with Stradtman as part of what this Court found to be "a calculated years long scheme in an attempt to case liability on the Defendants for actions [Stradtman] willfully took." Memorandum Opinion at 26.

### III. The Fees Defendants' Incurred In Defending Against Stradtman's Claim.

Defendants seek an award of attorneys' fees from the date the Court denied Plaintiff's Motion to Dismiss (November 26, 2014) through the date of the summary judgment hearing at which the Court granted Defendants' Motion for Summary Judgment (June 4, 2015). An award of fees during this time period would compensate Defendants for the extensive discovery and pre-trial efforts that this case required. As reflected in Table I below, these fees total $645,507.20. Alternatively, Defendants request that the Court award them fees from the day after Mr. Stradtman's initial deposition (March 23, 2015) through June 4, 2015. Those fees

(captured in Phases II and III of Table I) total $269,619.70.  Defendants bore significant additional fees in defense of Stradtman's claims which are not sought by this motion.[16]  The fees in Table I are supported by the declarations of Defendants' counsel, Bernard J. DiMuro (Exhibit I) and Ray C. Baldwin  (Exhibit J) (and the time records attached thereto) as well as the affidavits of Philip J. Hirschkop (Exhibit K)  and Victor M. Glasberg (Exhibit L).

---

[16]    For example, Defendants also incurred (but do not seek) fees in preparing and arguing the Motion to Dismiss and for efforts after the summary judgment hearing.  Defendants also incurred many other expenses that they are not seeking recovery of here including but not limited to fees for the DC action, fees for defending against Stradtman's damages in the *Taylor* litigation, mediation costs, and Defendants' evaluative and investigative efforts before the Complaint was served.

**Table I –Attorney's Fees Sought**

| Litigation Stage | Hours Expended (Rate) | Total Fees |
|---|---|---|
| Phase I:<br><br>11/26/14 through 3/23/15 (the date of Stradtman's Deposition)<br><br>Answer; Initial scheduling conference; Discovery | DiMuro  221.7 ($450)<br>Wright 288.7 ($337.50)<br>Mook 2.0 ($400)<br>Sakagami 55.3 ($270)<br>Baldwin 203.1 ($408)<br>Carle 163 ($375)<br>Vaidya 73.5 ($260)<br><br> | $99,765.00<br>$97,291.90<br>$800.00<br>$14,931.00<br>$82,864.80<br>$61,125.00<br>$19,110.00<br><br>**Subtotal:  $375,887.70** |
| Phase II:<br>3/24/15 to end.<br><br>Complete discovery and pre-trial proceedings (these entries exclude summary judgement efforts) | DiMuro  199.3 ($450)<br>Wright 158.5 ($337.50)<br>Mook 10.00 ($400)<br>Lieberman 24.9 ($400)<br>Sakagami 53.7 ($270)<br>Baldwin 131.3 ($408)<br>Carle 9.0 ($375)<br>Vaidya 10.8 ($260)<br>Christoff 1.3 ($340)<br><br> | $89,685.00<br>$53,493.75<br>$4,000.00<br>$9,960.00<br>$14,499.00<br>$53,570.40<br>$3,375.00<br>$2,808.00<br>$442.00<br><br>**Subtotal:  $233,633.15** |
| Phase III:<br><br>Summary Judgment Filings | DiMuro  40.4 ($450)<br>Wright 17.7 ($337.50)<br>Mook 10.1 ($400)<br>Baldwin 19.1 ($408)<br><br> | $18,180.00<br>$5,973.75<br>$4,040.00<br>$7,792.80<br><br>**Subtotal:  $35,986.55** |
| | **TOTAL** | **$643,707.20** |

Finally, the Defendants seek an award of some of their costs that were not listed on their Bill of Costs filed pursuant to 28 U.S. C. Section 1920, as reflected in Table II below.  Again, those costs are supported by the affidavits of Mr. DiMuro and Mr. Baldwin.

**Table II –Costs Not Sought Pursuant to 28 U.S.C. § 1920**

| Description | Exhibit | Amount |
|---|---|---|
| Expert Fees for Damages (Joseph Estabrook) | Exhibit 7 to DiMuro Affidavit (Exhibit I) | $30,626.00 |
| Expert Fees for Fiduciary Duty Issue (Professor Lyman Johnson) | Exhibit 6 to Baldwin Affidavit (Exhibit J) | $22,350.00 |
| E-Discovery | Exhibit 8 to DiMuro Affidavit (Exhibit I) | $111,424.46 |
| | **Total** | **$164,400.46** |

## IV.    The Fees Requested Are Reasonable.

The fees sought by Defendants are reasonable.  The case was hard fought, with extensive discovery and motions practice.  The hourly rates submitted in support of the claim for attorneys' fees are consistent with or less than those customarily charged in this jurisdiction, and the amount of time and resources spent to defend this case was clearly necessary.  This Court need look no further than the result obtained for justification of the time spent and the fees requested.

**Significant And Arduous Discovery.**  By their very nature, the claims asserted in this case required extensive discovery:

- Republic Services orders millions of carts each year and cart data had to be obtained and analyzed from around the country over a multi-year period;

- Allegations of cart losses in numerous regions of the country necessitated extensive investigation within each of those regions;

- Numerous third party subpoenas had to be issued to obtain documents and testimony, including from Stradtman's former employer, Otto, and the recruiting firm he worked with, as well as the corporate owner of his new employer;

- Republic Services collected, processed, and produced more than 10,000 documents (more than 27,000 bates stamped pages) of electronically stored information from numerous

custodians and paid, following the issuance of subpoenas to Otto by Stradtman and Defendants, for the hosting and production of more than 13,000 documents from Otto;

- Allegations dating back to at least 2008 ensured numerous persons with knowledge were no longer with the company and resulted in depositions throughout the continental United States, e.g. in upstate New York, South Carolina, Arizona, Ohio, Virginia, and Pennsylvania, and Canada;

- Stradtman's speculative and unsupportable damages claim--seeking tens of millions of dollars—was purportedly based upon what he might have earned had he stayed at Otto, including alleged equity in the company. Rebuttal of these enormous damages claims necessitated extensive analysis and examination by expert accountants;

- Stradtman's claim that an alleged fiduciary obligation to Otto and its employees compelled his resignation required Defendants to retain the services of a highly regarded law professor from Washington & Lee University to rebut Stradtman's assertion; and

- Stradtman took eleven depositions that Defendants had to attend, and Defendants took eight to rebut Stradtman's meritless claims.

Baldwin Aff., Exhibit J at ¶ 11.

Coupled with the extensive discovery described above, due to Stradtman's and his counsel's recalcitrance and obfuscation, Republic Services was forced to file three motions to compel, which were mostly granted but also initially denied in part until further evidence was developed. Docket Nos. 34, 37, 48, 73, 101. Some of the motions involved issues of privilege which ultimately were found to have been waived. Republic Services filed a motion for sanctions as a result of Stradtman's failure to produce documents after he waived the marital privilege, which resulted in an evidentiary hearing being held; while spoliation of evidence was not found by the Magistrate Judge, Defendants were awarded their attorneys' fees, which was not appealed. Dkt. No. 169.[17] Moreover, Stradtman sought to strike Defendants' fiduciary duty expert--despite Stradtman's reliance on a purported fiduciary duty as a basis for his resignation. Stradtman also took the unusual step of trying to change the substance of his deposition

---

[17] Defendants do not seek to recover those fees herein, but note the proceedings to demonstrate the highly contested nature of the litigation.

testimony through errata, which necessitated yet more motions practice.  Dkt. Nos. 148 and 95.

As this Court well knows, the summary judgment filings were substantial (Dkt. Nos. 143 and

164), as were the pretrial submissions, as trial was a mere month from the summary judgment

hearing.

**Fees Are Reasonable.**  "The most useful starting point for determining the amount of a

reasonable fee is the number of hours reasonably expended on the litigation multiplied by a

reasonable hourly rate."  *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see also Perdue v.*

*Kenny A.*, 559 U.S. 542 (2010) (noting that "lodestar approach," has "achieved dominance in the

federal courts") (citations omitted).  The United States Supreme Court has stated that there is a

"strong presumption that the lodestar figure  ... represents a reasonable fee…." *Pennsylvania v.*

*Delaware Valley Citizen's Council for Clean Air*, 478 U.S. 546, 565 (1986);  and the lodestar can

only be overcome in "rare" or "exceptional" circumstances.  *Perdue,* 559 U.S. at 552-3.

Here, the invoices submitted with this Motion show hours reasonably expended at

reasonable hourly rates. *See Equal Employment Opportunity Commission v. Nutri/System, Inc.,*

685 F.Supp. 568, 572 (E.D. Va. 1988) (Proper documentation is the key to ascertaining the

number of hours reasonably spent on legal tasks).  The Court is not required to look any further

to determine reasonableness.

However, to the extent that *Johnson v. Georgia Highway Express, Inc.,* 488 F. 2d 714

(5th Cir. 1974) remains viable post *Perdue,*[18] the *Johnson* factors underscore the reasonableness

---

[18]     *Perdue* calls into question the continued viability of the *Johnson* factors.  *Perdue, at 551*
(*Johnson* factors give very little actual guidance).  While the Fourth Circuit has not yet
completely jettisoned *Johnson,* it has recently indicated that any *Johnson* factors subsumed
within the lodestar analysis need not be considered twice.  *E. Associated Coal Corp. v. Dir.,*
*OWCP,* 724 F.3d 561, 570 (4th Cir. 2013) (if *Johnson* factors already considered in lodestar
analysis, "we do not consider [those factors] a second time.")  Indeed, the Fourth Circuit has
long had a somewhat flexible approach to the *Johnson* factors.  *See, Arnold v. Burger King*

of the hours worked and the rates charged.  *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir. 1978).[19]  The legal issues involved, had Stradtman prevailed, would have made new law in Virginia, and following the denial of the Motion to Dismiss based upon unsubstantiated representations made by Plaintiff, Defendants had to address and rebut each and every factual and legal issue raised by Stradtman, from constructive discharge based on his allegedly being "between a rock and a hard place,"[20] to his claim that Republic had retaliated against him and his wife by supposedly canceling orders from Otto without cause.  The pace of the docket, and the number of depositions, motions and issues necessarily meant the time pressures were significant and that other work was not performed.  The fees and costs requested, therefore, are reasonable.

### Conclusion

In light of the foregoing reasons, the Court should enter an order granting the Motion and enter an Order requiring Stradtman and CBCBJ to pay the requested awarding attorneys' fees and costs.

---

*Corp.*, 719 F.2d 63, 67 n. 4 (4th Cir. 1983) (internal quotation omitted) ("[t]he district court is not required to engage in a lengthy discussion concerning what portion of the award is attributable to each factor.").

[19]     The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–719.

[20]     This rock and a hard place was actually neither, as evidenced by Stradtman's securing a $270,000 payment from Otto, days after he had received a job offer from his new employer, and when he was, contemporaneously, asked to stay in his position with Otto. Memorandum Opinion at 26.

June 25, 2015                    Respectfully submitted,

**REPUBLIC SERVICES, INC.,** *et al.*

By Counsel

     /s/                             

Bernard J. DiMuro, Esq. (VSB # 18784)

Jonathan R. Mook, Esq. (VSB # 19177)

M. Jarrad Wright, Esq. (VSB #68814)

DiMuroGinsberg, P.C.

*Counsel for Defendants*

1101 King Street, Suite 610

Alexandria, Virginia  22314-2956

Ph. (703) 684-4333

Fax (703) 548-3181

bdimuro@dimuro.com

jmook@dimuro.com

mjwright@dimuro.com


Christine M. Costantino, Esq. (VSB # 86986)

Raymond C. Baldwin (admitted *pro hac vice*)

SEYFARTH SHAW LLP

*Counsel for Defendants*

975 F Street, N.W.

Washington, DC 20004

Telephone: 202.463.2400

Facsimile: 202.828.5393

ccostantino@seyfarth.com

rbaldwin@seyfarth.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of June, 2015, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

\_\_\_\_/s/_____

Bernard J. DiMuro, Esquire (VSB # 18784)
Jonathan R. Mook, Esquire (VSB # 19177)
M. Jarrad Wright, Esquire (VSB #68814)
DIMUROGINSBERG, P.C.
*COUNSEL FOR DEFENDANTS*
1101 King Street, Suite 610
Alexandria, Virginia 22314-2956
Ph. (703) 684-4333
Fax (703) 548-3181
bdimuro@dimuro.com
jmook@dimuro.com
mjwright@dimuro.com